TOBIAS, JR., Judge.
hThe defendant, David D. Dove (“Dove”), was indicted on 1 April 2010 for the 25 November 2009 second degree mur *98 der of Jacquian[1] Charles (“Charles”), a violation of La. R.S. 14:30.1, and the attempted second degree murder of Tereni-ka Barton (“Barton”), a violation of La. R.S. 14:(27)30.1. Dove pleaded not guilty as his 8 April 2010 arraignment. . On 26 January 2011, the trial court heard argument on Dove’s motion to suppress the evidence, .ultimately denying the motion on 19 July 2011, A 10-14 June 2013 jury trial found Dove .guilty as charged on both counts. Motions for new trial and for post-verdict judgment of acquittal were denied on 8 November 2013, which is also the date the trial court imposed the consecutive sentences of life imprisonment for second degree murder and thirty-five years for attempted second degree murder (both sentences to be served at hard labor without benefit of parole, probation, or suspension of sentence). This appeal followed.

STATEMENT OF FACTS

The State’s Evidence

Testimony of Sergeant Kevin Bums, Jr.

LNew Orleans Police Department (“NOPD”) Sergeant Kevin Burns, Jr. investigated the 7 June 2009, murder of Arthur “Rat Rat” Brown (“Mr. Brown”). As the lead investigator, the sergeant, developed Michael “Big Mike” Allen and Michael “Lil Mike” Treaudu as suspects in Mr. Brown’s homicide. Michael Allen was convicted of the second degree murder of Brown, and Michael Treaudu pleaded guilty to the manslaughter of Mr. Brown. No other suspects were developed or tried for the murder of Mr. Brown.

Testimony of Shakta Jackson ■

Shalita Jackson (“Ms. Jackson”), the mother of Charles (one of the victims in this case), testified that at the time of Charles death, he was living with his two sisters and- her in the Algiers section of New Orleans and was the father of five children. He was employed by Louisiana Green Corps. He and Shawntrell Brown (“Ms. Brown”), the sister- of one of the mothers of his children, were sharing the use of a burgundy-colored Nissan Murano vehicle. Ms. Brown'allowed Cornell Berry (“Mr. Berry”), her boyfriend and Dove’s brother, use of the Murano, which caused a problem between Charles and Ms! Brown. When Charles attempted to get the Murano from Mr. Berry, they got into a fight. Ms. Jackson learned that Charles had been shot and killed on 25 November 2009. Although she spoke to NOPD detectives that day, she could remember very little, of the conversation. Ms. Jackson recounted that Charles.and Michael Allen were very good friends. Charles was also friends with “Woe,” “Boom,” and “Turtle,” whom she knew to be members of the Black Flag Mafia (“BFM”) that operated out of the Cutoff area of Algiers. However, Charles and Michael Allen were not members of the BFM.
Under cross-examination, Ms. Jackson admitted that at the time Charles was killed, he was in violation of court imposed curfew; she denied he dealt drugs.
| ¿Testimony of Dr. Cynthia Gardner
Dr. Cynthia Gardner of the Orleans Parish Coroner’s Office performed an autopsy on the body of Charles and concluded that he suffered thirteen gunshot wounds to the back of his body — nine to his torso, several of which were fatal, and four to the upper and lower extremities. Dr. Garner recovered six bullets from Charles’ body during the autopsy. She noted that gunshots pierced Charles’ left kidney, liver, small intestine, right lung, left adrenal gland, *99 small bowel, diaphragm, spleen, pancreas, and stomach. The gunshot wounds were delivered from a distance of approximately two feet from the victim’s body.

Testimony of Detective Richard Chambers

NOPD Detective Richard Chambers assisted lead Detective Kevin Burns, Jr. in the investigation of the shooting death of Mr. Brown, which occurred in the 5700 block of Red Maple Drive in Algiers. Detective Chambers knew Mr. Brown to be a member of the BFM, a gang noted- for shootings and dealing drugs. He knew Michael Allen and Michael Treaudu were convicted of the Brown homicide.
As lead detective, Detective Chambers investigated the 25 November 2009, 9:30 p.m., shooting death of Charles in the 6400 block of General Meyer Avenue in the Cutoff area of Algiers. The shooting occurred in front of a neighborhood barbershop. By the time the detective arrived at the scene, both victims, Charles, who was deceased, and Barton, who was critically wounded, had been transported to University Hospital. The detective recalled that the scene was well lit. He observed a black four-door Pontiac Grand Prix with a bullet hole in its windshield and a pellet on the baby seat in the rear of the vehicle, as well as several spent'shell casings on the ground in front of the vehicle. However, the police did not' discover any witnesses to the shooting. Detective Chambers dispatched NOPD Detective [4Greg Hamilton to check on Barton’s status and obtain information about the shooting. While on the scene, Detective Chambers spoke with Ms. Brown, who informed him that the burgundy Murano parked in the adjacent barbershop parking lot belonged to her, and she allowed the deceased to use the vehicle for transportation to get his hair cut. According to Detective Chambers, Ms. Brown was not upset.by news of the shooting and the deceased’s death.
Later in the evening, the detective spoke to Ms. Jackson, who was unable to provide any information on the shooting; however, she told him that the deceased was having a problem with Mr. Berry. Detective Chambers said that Mr. Berry was not a suspect in this case because he was incarcerated at the time of the shooting.
The day after the shooting, Detective Chambers obtained a description of the shooter — seventeen years old, thin black male, ■ approximately 5' 4" in height, with short hair — from Barton. The detective’s investigation led to the defendant, a known member of the BFM, as the shooter.
On 6 December 2009, Detective Chambers showed Barton a photographic lineup (introduced as an exhibit) from which she immediately identified Dove as the man who shot her and the deceased. She also said that the shooter came out of the barbershop. The detective prepared a warrant for Dove’s arrest and a search warrant for his last known address, 2145 Comet Street. Dove was arrested, and his residence searched on 8 December 2009, at which time Detective .Chambers spoke to the defendant’s mother, Aline Dove. Officers confiscated a black hooded sweatshirt and cell phone from the defendant’s bedroom.. The cell phone indicated that it belonged to “ ‘BFM Gunna,’ ” and contained a contact list (introduced in evidence) displaying the names: “BFM B; BFM Boom; BFM Buster; BFM Doe; |fiBFM Fresh; BFM Herbert; BFM Julio; BFM Joe Crack; BFM Prim; BFM Roy; BFM Streets; BFM Vee; BFM Wayne; BFM Woo; BFM Jarod.” The detective obtained a list of calls made and received by Dove on the day of the, shooting (an exhibit in evidence).
Under cross-examination, Detective Chambers admitted that he did not know *100 the identity of the people listed as contacts on Dove's phone; neither did he know whether those individual were- members of the BPM. He also acknowledged that no fingerprints or DNA evidence were recovered in connection with this investigation.

Testimony of Terenika Barton ■

Terenika Barton testified she was twenty-five years old, lived in New Orleans, had two children, and was dating Christian Griffin at .the time .of this trial and the shooting; Barton said' she met Charles in October. 2009'through her sister, Ashley Barton, who -was dating Keeva Bennett, Charles’ friend. Ms. Barton said she and Charles had seen each other from the day they met to -the time of his death, but they did not have a romantic interest in one another. -
On 25 November 2009, Barton received a-cell'phone call from Charles at approximately 8:30 p.m.: He called her on -Lil Woe’s cell- phone and asked her to meet him at the barbershop on General -Meyer Avenue. She drove to the barbershop from her; mother’s home in. her black Grand Prix vehicle, accompanied by-her one-year-old son seated in the rear of her vehicle. She entered the barbershop to summon- Charles and returned to her vehicle, sat ori-the hood on the front passenger side of the car, and spoke to Charles as he stood next to her car." A few minutes later, she and-Charles moved to the Mura-no that Charles had driven to the barbershop, which-was parked behind her car, and continued their 1 ^conversation. -She and Charles were speaking for approximately fifteen minutes when he turned to speak to someone standing in-front of the barbershop. As he turned back toward her, Barton noticed a man with a gun in his hand approach and ' stand behind Charles. She alerted Charles to the presence of the armed man, and at that moment, the man shot Charles. Both she and Charles fell to the ground. Barton was on her back with Charles on top of her, shielding her from the gun fire. The gunman stood directly over them and continued shooting even .as she begged him to stop. She was able to get a clear view of the gunman’s face. After he was shot, Charles told her: “They got me.” After the shooting stopped, Barton called her mother and the police. Although Barton had clearly, seen the shooter’s face, she told the 911 operator she did not see the shooter because she was afraid the. shooter was - still in- the area and would hear her say she could identify him.
After being transported to the hospital, Barton described the shooter for the police — young, slim build, 5' 4" black male with short hair. The day after the shooting, Barton supplied Detective Chambers with the same description of the shooter and told the detective that Mr. Berry was a person with’ whom Charles had a problem. A few days after the shooting, Barton identified Dove as the shooter from a photographic'lineup compiled by Detective Chambers.
While Barton was hospitalized, her sister, Ashley, and her boyfriend, Keeva, visited and showed her a group picture. Barton said she feared retribution from Dove and/or . his family for testifying against him, so much so that at motions hearings she told defense counsel she was not certain that the defendant was the shooter. However, at trial she said she was 100% certain Dove was the shooter.

Testimony of Jason Daniels

17Jason Daniels (“Mr. Daniels”) was called as-a witness; he confirmed that he was incarcerated at the time of trial on firearm and drug possession convictions. Around Thanksgiving of 2009, Mr. Daniels was visiting family in the Cut Off area of Algiers. - At that time, he knew Arthur Lee Brown, who was a member of BFM, *101 and Mr. Brown’s brother, Demond “Smurf’ Brown. Mr. Daniels said he knew Mr. Berry and Dove, who was also a member of BFM. He identified “Woe,” “Boom,” and “Turtle” as members of the BFM and friends of the defendant. Mr. Daniels also knew Michael Allen, Charles’ close friend, and Charles, though neither of them was a member of BFM. Continuing, Mr. Daniels reported that Mr. Brown was murdered in June 2009, and that Michael Allen and Michael Treaudu were ar-' rested for the murder.
On 25 November 2009, between 8:30 p.m. and 9:00 p.m., Mr, Daniels was walking in -Algiers, to purchase heroin and decided to walk to the barbershop on General Meyer Avenue. He looked in the barbershop and saw “Boom” and ‘Woe.” He also noticed, Charles and a female standing near a black Grand Prix automobile. About fifteen minutes later, he saw Dove, wearing a black hoodie and dark jeans, walk from behind the barbershop building. Instead of going into the barbershop, Dove pulled the hoodie over his head and walked straight to Charles and the female to whom Charles was speaking. The defendant pulled a gun from his right side and began to shoot Charles, who had his back turned, and the female sitting on the right front of the Grand Prix. Charles was hit several times and fell to the ground on top of the female, shielding her from the gunfire. While Charles and the female were on the ground, Dove stood directly over them and continued to fire. When the shooting stopped, Dove ran away, as did he because he did not want to be involved or talk to the police. Mr. Daniels said he did not care that | sCharles had been shot because there was a rumor that Charles was in the vehicle when Mr. Brown was killed. Mr. Daniels testified that he was present when the weapon used to kill Charles was traded to “Bee” and “Mai,” members of the Swu Woo gang, for another gun.

Testimony'of Chanel Long

Chanel Long (“Ms. Long”) testified that while she was with the Orleans Public Defender’s Officer she represented Mr, Daniels on drug and gun charges. During the course of her representation of Mr. Daniels, he told her he had information on this crime. Consequently, Ms. Long and Mr. Daniels 'met on; three occasions- with prosecutors and investigators. Ms. Long recalled that at no time during those meetings did Mr. Daniels see or review the police report Or crime scene photographs of this ease. Mr. Daniels gave the prosecutors the information about this crime in his own words.!

Testimony of Detective Corey Foy

NOPD Detective Corey Foy testified that on 27 January-2010, he and his partner were • conducting proactive narcotics patrol and traffic stops. On that day, he stopped a white Pontiac automobile at the intersection of Newton Street and Behr-man Highway for not having an illuminated license plqte. As Detective Foy and-his partner approached the Pontiac, Jamal Jones jumped from the front passenger .seat and ran; however, the officers apprehended him. .The officers returned Mr. Jones to the Pontiac; a black Glock 40-caliber, semi-automatic handgun and marijuana on the floor in front of the seat from which Mr. Jones bolted was confiscated. An NCIC check on the gun retrieved indicated, that the weapon was stolen i.n Jefferson Parish. Mr. Jones admitted ownership of the gun and marijuana located in the Pontiac. Detective Foy added that he was familiar | nwith the gangs in Algiers— SWU WOO, Whitney Boys, D-Block, Hot Block, BFM, and Cutoff. The detective also said that through his investigation, he *102 learned that Mr. Jones was a member of the SWU WOO gang.

Stipulation

The state and the defense stipulated that ballistics testing proved that the casings collected from the scene of this murder were fired by the weapon seized from Jamal Jones.

Testimony of Don Hancock

Don Hancock, the telephone supervisor for the Orleans Parish Sheriffs Office, testified that his duties involved maintaining all telecommunications systems used by the Sheriffs Office. One of the systems maintained by Mr. Hancock was telephone calls made and received by inmates at Orleans Parish Prison (“OPP”). Mr. Hancock explained that during booking, each inmate is assigned a folder number, which is the inmate’s ID number while he incarcerated. The folder number is used as a PIN number for an inmate to use the jail’s telephone system.
Mr. Hancock identified a state exhibit as the recording of the defendant’s phone calls from 1 December 2009 through 28 September 2010.

Testimony of Detective Mike Kitchens

Detective Mike Kitchens, an investigator with the Orleans Parish District Attorney’s Office, was tasked with taking a picture of the brick building housing the barbershop near this shooting scene. The wall of the building contained graffiti reading: “BFM” and “RIP Rat.” Detective Kitchens identified the photograph he took (an exhibit in evidence) and said he could not say when the graffiti was applied to the wall.

_f¡¡fThe Defendant’s Evidence

Testimony of Margaret Parker

■ The defense called Assistant District Attorney (“ADA”) Margaret Parker, who screened Dove’s case in March 2010. On 8 March 2010, Ms. Parker interviewed Barton. The interview took place in Ms. Parker’s office in the presence of Investigator Morgan Preston and Detective John Dil-mon. Barton informed Ms. Parker that on 3 December 2010, her sister, Ashley, showed her a group photograph, from which Barton identified the defendant. A day later, Barton picked out the defendant from a police photographic lineup. Ms. Parker’s interview notes indicated that when Barton viewed the lineup on 4 December 2010, she identified Dove as the shooter. Ms. Parker’s notes further indicated that Barton initially said she was uncertain of her identification made from the police lineup because she may have had the picture her sister showed her in her mind. However, Barton said that when she viewed the police photographic lineup, she picked out the defendant as the man that stood over her and Charles and shot them.

Testimony of Lynn Schiffman

Next, ADA Lynn Schiffman testified that she was a prosecutor on this case from January 2010 until the motions hearings on 19 May 2011. Ms. Schiffman did not recall telling defense counsel that Barton initially said she was uncertain of her identification; however, the information did come out during the motions hearings. Ms. Schiffman recalled discussing with Ms. Parker Barton’s uncertainty about whether Barton saw the photograph her sister had prior to or after Barton viewed the police photographic lineup. Ms. Schiffman testified that Barton said that on the day she viewed the photo lineup with Detective Chambers, she was 100% certain that Dove was the person who shot her and Charles, and the photograph her sister |nhad shown her had no bearing on the identification she made from the police photographic lineup.

*103
Testimony of Myrm Williams

Myrna Williams, a Rite Aid pharmacist at its General DeGaulle Drive location, verified pharmacy records' belonging to Emma Jean Smith. Ms. Williams testified that the pharmacy records indicated that a prescription for Ms. Smith was picked up at 7:56 p.m. on 25 November 2009; however, she said there was no way to know who pickéd up that prescription.

Testimony of Detective Greg Hamilton

NOPD Detective Greg Hamilton testified that Detective Richard Chambers was the lead detective in this case. Detective Hamilton was assigned by Detective Chambers at 10:43 p.m. on the night of the shooting to go to the hospital with the victims. When Detective Hamilton arrived at the hospital, Barton was in route from the shooting scene.' She was taken immediately to Room 4 and was hot allowed to talk to relatives'or friends. "However, he spoke to.her and learned that she and Charles were standing, next to her car conversing, when a man exited an adjacent barbershop twirling a gun on his finger and shot them. She explained that Charles fell on top of her to shield her from the gunfire. Detective Hamilton collected the clothing worn by the shooting victims that night.

Testimony of Agnes Jean Bittner

Agnes Jean Bittner testified that she was a registered nurse and the hospital liaison person at University Hospital on the night Barton was brought in for treatment of gunshot wounds to her legs. Ms. Bittner was assigned the task of obtaining information about a patient from the patient or her (family if the patient is unable to speak.
| 12Ms. Bittner recounted from her report that she received notice that Barton was at the hospital at about 10:25 p.m. and able to speak. Ms. Bittner also noted she spoke with Barton’s mother and sister at approximately 10:23 p.m. Ms. Bittner stated that typically the police are the first people allowed to speak to a trauma patient.

Testimony of Emma Jean Smith

Emma Jean Smith (“Ms. Smith”) testified that on the night of 25 November 2009, her house caught fire, so she moved in with her cousin, Aline Dove. Ms, Smith verified that Aline Dove is the defendant’s mother. When Ms. Smith first arrived at Ms. Dove’s home, the defendant was not there; however, between 7:00 p.m. and 8:00 p.m. in the evening, the defendant telephoned his mother’s house, and Ms. Smith spoke to him. He asked her to have his mother come pick him up at the gym. Ms. Smith relayed- the message and gave Ms. Dove money to stop at the Rite Aid pharmacy and pick up her (Ms. Smith’s) medication, which Ms. Dove did. When Ms. Dove came home, the defendant was with her and went upstairs to his bedroom. Ms. Smith did not see the defendant enter the house, Ms. Smith heard a 10:00 p.m. newscast about a shooting on, General Meyer Avenue. The defendant was upstairs at the time of the news , report. She did not see him but heard his voice from an upstairs bedroom.
Under cross-examination, Ms. , Smith said she did not see the. defendant enter but rather heard him in the upstairs portion of the house. When questioned about the telephone number Ms. Smith told the police the defendant called his mother from that night, she could not explain why Ms. Dove’s phone records did not conform to the information she gave the police. Ms. Smith also could not |1sreconcile the statement she gave the police during the investigation of this case and the answers she was providing on cross-examination.

Testimony of Ivory ana Davidson

Ivoryana Davidson testified as a friend of Dove. She, Woodnisha Watts, Jasmin *104 Berry, and “Mini” arrived at Dove’s house on 25 November 2009 about 5:00 p.m., went into the defendant’s mother’s room, and watched TV. Dove joined them later because he was not at home at the time they arrived. The defendant came home with his mother at about 8:00 p.m. At about 9:40 p.m., the defendant answered the telephone. Ms. Davidson heard the caller tell the defendant that someone had been shot in the Cutoff. Dove told his mother he never left the house .that evening. Ms. .Davidson recalled that she left the Dove residence after midnight, and Dove was still at home.

Testimony of Ashley Brignac

Ashley Brignac testified that she was a friend of Aline Dove. Ms. Brignac went to Ms. Dove’s home on 25 November 2009 at about 8:00 p.m. When she arrived, Ms. Smith, Mini, Latoya, Dove, and others were there, She saw the defendant at the house in Ms. Dove’s bedroom watching TV at about 9:00 p.m. At about 9:40- p.ni., someone called the Dove residence-to tell them that someone named “Jacques” had been shot near a barbershop on General Meyer Avenue. Latoya answered that phone call.
They turned on the TV about 9:45 p.m., and the news east reported a shooting in Algiers.- Ms. Brignac remained at the Dove residence until 3:00 a.m. and recalled that in all the time she was there, the defendant never left the house. Ms. Brig-nac gave a statement at the District Attorney’s Office personnel sometime after the shooting.
|14On cross-examination, Ms. Brignac said she did not see the defendant enter the Dove residence the night of the shooting. She arrived at about 8:00 p.m., and Mrs. Dove was there. Ms. Brignac used the bathroom- about an hour after her arrival and saw the defendant watching TV in his mother’s bedroom. He was alone; no one else was watching TV with him. However, when the 10:00 p.m. news came on, Dove watched the newscast with everyone at the residence.

Testimony of Shawntrell Brown

Shawntrell Brown testified that Mr, Berry was her boyfriend. (Ms. Brown stated that her sister, Ashley Brown, died in childbirth.) Ms. Brown obtained custody of her deceased sister’s children — Je-mia Brown and Gyvan Charles, who were the children of the deceased, Charles, As a result of a successful malpractice suit, a trust was set up for Jemia and Gyvan. The trust purchased a Murano vehicle for the children’s benefit. Ms. Brown allowed Mr. Berry to drive the vehicle — a situation that caused a dispute between Mr. Berry and Charles. However, Ms, Brown added that the two men were not feuding at the time of the murder.
On the morning of the shooting, Ms. Brown and Charles drove the Murano to run errands and pick up Charles’ children. At about 3:00 p.m., Charles drove Ms. Brown to her place of employment. Later in the evening, two of her friends called to tell her that Charles had been shot near a barbershop on General Meyer Avenue. When her shift ended at 11:00 p.m., Ms. Brown went to the scene. Detective Chambers-told her that Charles was deceased. She told Detective Chambers the Murano belonged to her and asked for the keys. He told her the keys were with the detective at University Hospital. When Ms. Brown arrived at the hospital, some members of Charles’ family were present, and she learned that a Terenika Barton had been shot along with Charles. Ms. Brown added that Charles | iasold drugs on a daily basis and owed people money. On the day of the Dove’s arrest, Detective Chambers had interviewed her.
*105 On cross-examination Ms. Brown said that Dove could not have committed the murder because his family told her he did not because he was at home that night.

Testimony of Jason Lewis

Jason Léwis testified that Jason Daniels was his son and was not in New Orleans on 25 November 2009. Mr. Lewis said he was certain that his- son did not witness the shooting in November 2009.

Testimony of Detective Richard Chambers

The defense re-called NOPD Detectivé Richard Chambers, who verified that he was the lead detective on this 'case, and that he assigned Detective Greg Hamilton to relocate to University Hospital at 10:43 p.m. on the night of the shooting to check the status of the victims. Detective Hamilton confiscated -' the victims’ clothing, which was not tested for gunshot residue.

Testimony of Jamal Jones

Jamal Jones admitted that he had convictions for firearm and drug violations in Orleans and Jefferson Parishes. On 27 January 2010, he was arrested and charged with possession of a firearm and controlled dangerous substances. The firearm he had in his possession at that time was a Glock 40, which he had gotten from the now deceased “Chuck,” a friend of his deceased brother, Bryan Jones. Dove was not present when he obtained the Glock from Chuck. Mr. :Jones did not know the defendant at that time.- He related to a prosecutor and investigator the facts of how he received the Glock.
hfiUnder cross-examination Mr. Jones admitted he was known as' “Mai.” He denied being a member of the SWU WOO gang; however, he did say that his deceased brother was a member of that gang. Mr. Jones was unaware that violence was perpetrated by the gang. When questioned whether he gave a thumbs-up sign to Dove when he entered the courtroom, Mr. Jones replied that he flashed everyone in the courtroom the peace sign, even the prosecutor. He denied ever seeing Mr. Daniels and was unaware of the existence of the BFM, but he was familiar with the SWU WOO and D-Block gangs.
Upon re-direct examination, Mr. Jones said he was in Harvey, not Algiers, when he received the Glock.

Testimony of Desmond Benn

Desmond Benn testified that he worked in a store located next.to the barbershop where this shooting occurred and was in the barbershop on the night of the shooting from about 7:00 p.m, to 11:00 p.m. He spoke to the police after the shooting and told them he had not seen anyone involved in the incident. He denied that Dove, his longtime acquaintance, or Mr. Daniels-was in the barbershop or anywhere in the area on the night of the shooting. Mr. Benn recalled that there’had been graffiti oh the wall of the barbershop at the time of the shooting, but said it had just recently been painted over. He added that Charles had been in the barbershop for about an hour before he was shot:
On cross-examination, Mr. Benn recalled that only he, the barber, one customer, and a barbershop employee were in the barbershop on the night of the shooting. He denied that Mr. Daniels had opened the barbershop door and said hello. The only person Mr. Benn recalled seeing outr side the barbershop that night was Darryl “Boom” Sullivan.

117Testimony of Latoya Berry

Latoya Berry, Dove’s older sister, testified that after work on 25 November-2009 she walked to her mother’s house. ’• She along with Dove’s mother, Ms. Smith, and Ms. Berry’s -little sister, Madrid; prepared food for thé following day. While cooking, several friends and family members came *106 to the residence. Dove arrived at the house- with Ms. Dove, who had picked him up from playing basketball at the gym, at approximately 8:10 p.m. Later in the evening, before 9:00 p.m., Dove and Ivoryana Davidson watched television in Ms. Dove’s bedroom., Ms. Berry learned of the shooting in a telephone call from her children’s father while she was at Ms. Dove’s residence. About fifteen minutes later she learned that Charles had been shot and killed. The defendant was at Ms. Dove’s residence at the time Ms. Berry learned of the shooting; >he had not left prior to the shooting. Ms. Berry was unaware of- any problems between Charles and Mr. Berry.
: - While being cross-examined, Ms. Berry admitted that between 9:15 and 9:45 p.m. on 25 November 2009, she did not actually see Dove in her mother’s residence.

Testimony of Aline Dove

Aline Dove, the defendant’s mother, testified, listing her. children as Rojaunda Berry, Latoya Berry, Cornell Berry, the defendant, and Madrid Dove. Ms. Dove related that on the evening of the shooting she was at home with her children and Ms. Smith cooking the next day’s Thanksgiving Day meal. Ms. Smith answered a call .from the defendant requesting that his mother pick him up from the gym. On the way home from picking up Dove at the gym, Ms. Dove stopped at the pharmacy at 7:56 p.m. and picked up Ms. Smith’s medication. _[i2When she returned home about fifteen minutes later, Ms. Dove went into the kitchen to cook, and the defendant went upstairs to shower. A few minutes later, Ms. Dove noticed Dove and Ivoryana Davidson watching television in Ms. Dove’s room. She learned of the shooting from a telephone call from her daughter’s ex-boyfriend, Melvin Carter. Shortly after that, the 10:00 p.m. news reported the shooting. Just after the phone call from Melvin Carter, everyone in the house,-, including the defendant,- went into the den to listen to the news broadcast. According to Ms. Dove, the defendant did not leave the house that night from the time Dove came home from the gym.
Ms. Dove related that the defendant had known Charles from childhood in the Cutoff. She also related that Shawntrell Brown, Mr. Berry’s girlfriend, had a Mu-rano vehicle, which she allowed Mr. Berry to drive.
On 8 December 2009, the police arrested Dove for the murder. Sometime after his arrest, Detective Chambers and other officers executed a search warrant at the Dove residence. The police confiscated Dove’s cell phone, his ID, and a black jacket that belonged to Ms. Dove’s cousin, Mitchell Ricard.
Answering the prosecutor’s questions, Ms. Dove denied that Ms. Brown called her on the night of the shooting and said that Charles had been shot. She denied telling the detectives that she knew Charles was dead at 9:40 p.m. on the night he was shot. She also denied telling Detective Chambers after the defendant was arrested that she heard there were rumors on the street that Dove shot Charles. Although Ms. Dove was certain that the defendant did not leave her house on the night of the shooting, she could not say she saw him in the residence at 9:35 p.m.
■ Testimony .of Rojaunda Berry
113Rojaunda Berry verified that Aline Dove was her mother and that the defendant was her younger brother. Ms, Berry stated that she was not at her. mother’s residence on the evening of the shooting. At that time, she .had three or four cell phones in her name. One of the phones was used by Dove.
Ms. Berry learned of the shooting from Melvin Carter, her sister Latoya Berry’s children’s father. Mr. Carter called her *107 on the night of the shooting from Latoya Berry’s residence. While she was speaking with Mr. Carter, he got a phone call about a shooting in the Cutoff. After walking to the shooting scene, Mr. Carter called Ms. Berry to tell her that Charles and his girlfriend had been shot.
Ms. Berry corroborated Ms. Dove’s testimony that Ms. Dove gave Ms. Berry the marijuana she found in Dove’s pants pocket on the night the police searched the Dove residence. Ms. Berry received the marijuana from Ms. Dove and gave it to her grandfather, who threw it away.

Rebuttal Testimony by the State

Testimony of Jason Daniels

On rebuttal, Mr. Daniel stated that he discussed with the District Attorney and his attorney threats he had received shortly before this trial. One threat came from a person on the same tier in OPP as Mr. Daniels. The threat was that Mr. Daniels and his father would.be killed if Mr..Daniels “ratted” on Dove. Romalis James delivered that message to Mr. Daniels and said that the threat came from “Melvin.” Mr. Daniels pointed out Dove as the man he saw murder Charles.
During cross-examination, Mr. Daniels explained that his. father, Jason Lewis, denied at trial, that Mr. Daniels was in the city at the time of this shooting because he feared for their safety and the family’s safety after trial. Mr. Daniels said his father followed the code of the street-you . do not snitch on anyone. He 12flaIso said that on the day of trial, he and Dove were placed together in the holding tank without the presence of deputies, and the defendant removed his belt as if he was going to do something to him. On another pre-trial occasion, as Mr. Daniels and the defendant were being returned to their cells, the defendant told Daniels: “It’s over for you.” Mr. Daniels interpreted the defendant’s comment to mean that he would be killed if he testified.

ERRORS PATENT

A’review of the record reveals one error patent. The record indicates that the trial judge sentenced Dove less than twenty-four hours after -denying his motions for new trial and post-verdict judgment of acquittal. Pursuant to La.C.Cr.P. art. 873, a twenty-four hour delay between a denial of a. motion .for new trial and sentencing is required unless the delay is waived by the defendant:
La.C.Cr.P. art. 873 expressly requires a twenty-four hour delay between the denial of both a motion for hew trial and a motion in arrest of judgment. In [State v.] Wilson, [404 So.2d 968 (La.1981) ], this court held that a trial court’s failure to delay sentencing for at least twenty-four hours after dénying a motion for a new trial or after denying a motion for post-verdict judgment of acquittal should be treated analogously....
Under La.C.Cr.P. art. 873, if a motion for new trial or motion in arrest of judgment is filed, sentence shall not be imposed until at least twenty-four hours after the motion is denied, unless the defendant “expressly” waives the delay or’pleads guilty. It is well-settled that a defendant may implicitly waive the twenty-four hour delay. See State v. Pierre, 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903 (implicit waiver where defense counsel responds in the affirmative when trial court inquires if he is ready for sentencing).
State v. Green, 10-0791, pp. 20-21 (La. App. 4 Cir. 9/28/11), 84 So.3d 573, 586.
|2iln this case, defense counsel waived the twenty-four hour delay by acknowledging the defense was prepared for sentencing after the denial of the defendant’s post-trial motions. Consequently, *108 we find no action is necessary in this instance.
We address another potential error patent infra in discussing Dove’s fourth assignment of error relating to whether his life sentence without benefit of- parole, probation, or suspension of sentence is appropriate.

ASSIGNMENT OF ERROR NUMBER 1

In his first ’ assignment, the defendant argues the evidence is insufficient to support his convictions. '
This court set forth the well-settled standard of review for sufficiency of the evidence in State v. Watkins, 13-1248, pp. 13-14 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, 303, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court .must determine whether, viewing the. evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty -beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty’ simply because the record contains evidence that tends to support each fact necessary to constitute the crime, State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact coiild disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mus-sall; Green; swpra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the I ¡^weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The testimony of a single witness, if believed by the trier of fact, may be sufficient to support a conviction. Id., citing State v. Wells, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it' is clearly contrary to the evidence. Id. '
Dove was convicted of one count of second degree murder and one count of attempted second degree murder. La. R.S. 14:30.1 A defines second degree murder, in part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal con *109 sequences to follow his act or failure to act.” La. R.S. 14:10(1). Determination of specific criminal intent is a question of fact for the trier of fact. State v. Huizar, 414 So.2d 741, 751 (La.1982). Specific intent need not be proven as a fact, but may be inferred from the circumstances of bathe transaction and the actions of defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982).
In addition to proving the statutory elements of the charged offense at trial, the state is required, to prove, a defendant’s identity as the perpetrator. State v. White, 14-0397, p. 18 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189, Where the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.[2]
In a prosecution for attempted second degree murder the state must prove that the defendant: (1) intended to kill the victim and (2) committed an overt act tending towards the accomplishment of the victim’s death. State v. Jones, 12-0891, p. 21 (La.App. 4 Cir. 8/7/13), 122 So.3d 1065, 1077, citing State v. Johnson, 08-1488, p. 9 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 334; La. R.S. 14:27; and La. R.S. 14:30.1.
Though the state .lacked any physical evidence connecting Dove to these crimes, the state offered the testimony of the two eyewitnesses at trial. A positive identification by only one witness may be sufficient to support a conviction. State v. Dussett, 13-0116, p. 7 (La.App. 4 Cir. 10/2/13), 126 So.3d 593, 599, writ denied 13-2559 (La.4/11/14), 137 So.3d 1214.
Barton testified that she was with Charles at the barbershop on General Meyer Avenue at approximately 8:30 p.m. on the night of 25 November 2009. She was seated on the front of her parked car waiting for Charles when she noticed JUDove standing next to Charles near the barbershop door, Charles walked away from the defendant towards her. As Charles got closer to her, Barton alerted him that Dove was armed. Charles looked back briefly but continued walking toward her. At that point, gunfire erupted. Dove shot Charles three times in the back and continued to approach them while firing the gun. Barton was shot in both legs, which caused her to fall to the ground on her back. Charles threw his body over her as the defendant stood directly over them and continued to fire. She pleaded for the shooting to stop, but her plea went unheeded. Barton recalled that the shooter shot Charles’ near lifeless body several more times in the back. She recalled that the defendant wore a black hoodie at that time.,
Mr. Daniels also witnessed the shooting. He recounted that he was in route to meet his heroin dealer, and wound up near the barbershop on General Meyer. Avenue. Mr. Daniels opened the. door of the barbershop to see if he knew anyone there and then walked toward the street, where he saw Charles speaking with Barton near a black car. About fifteen minutes later, Mr. Daniels observed the defendant walk from behind the barbershop, pull up. the hood on his black jacket, approach Charles and Barton and pull a gun from his right side. Dove deliberately approached the victims and began shooting them. Eventually, the defendant stood directly over the victims and fired several more times.
Forensic pathologist .Dr. Cynthia Gardner performed the autopsy on the victim’s *110 'body, finding that he had been shot thirteen times in the back at close range.
The defense argues that the testimony of its witnesses outweighs that of the state’s witnesses. Several family members testified for the defendant, attesting that he could not be guilty of the second degree murder of Charles or the attempted _J^second degree murder of Barton because he was at home with them at the time shooting occurred.
The jury chose to credit the testimony of the state’s witnesses over the defendant’s witnesses. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
In addition, Dove maintains his conviction for the attempted second degree murder of Barton cannot stand because the state failed to prove he had the specific intent to kill or cause great bodily harm to her.
Dove’s contention ignores the doctrine of transferred intent, which provides that when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim, then it would be unlawful against the person actually or accidentally shot, even though that person was not the intended victim. State v. Weathersby, 13-0258, pp. 11-12 (La.App. 4 Cir. 4/16/14), 140 So.3d 260, 268.
Viewing the evidence in the light most favorable to the state (as the law and jurisprudence require), we find the jury could have reasonably concluded that Dove was guilty of second degree murder of Charles and of attempted second degree murder of Barton, both conclusions being supported by the record of this proceeding and the applicable law. This assignment has no merit.

ASSIGNMENT OF ERROR NUMBER 2

In a second assignment, Dove maintains that the trial court erred by denying his motion to suppress the identification made by Barton. The defense argues that | gfithe witness’ identification was tainted because her sister showed her a group photograph, which purportedly contained an image of Dove. Consequently, the defendant claims Barton’s subsequent identification of him from a police lineup was unreliable and should have been suppressed.
A defendant has the burden of showing that an identification was suggestive and that the procedure resulted in the likelihood of misidentification. State v. Holmes, 05-1248, p. 6 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161, citing State v. Prudholm, 446 So.2d 729, 738 (La.1984). A “suggestive identification” is one that unduly focuses a witness’ attention on the defendant. However, even if a defendant shows that an identification is suggestive, a defendant’s due process rights are only violated if a showing is made of the likelihood of misidentification. Holmes, supra; State v. Thibodeaux, 98-1673, p. 21 (La.9/8/99), 750 So.2d 916, 932. A trial court’s ruling on the admissibility of an identification is entitled to great weight and must not be disturbed unless the trial court abused its discretion by so ruling. Holmes, supra; State v. Offray, 00-0959, p. 5 (La.App. 4 Cir. 9/26/01), 797 So.2d 764, 769.
In this case, Dove has not shown that Ms. Barton’s pre-trial identification was tainted by an unconstitutionally suggestive procedure. In State v. Gilmore, 11-1606, *111 pp. 2-3 (La.App. 4 Cir. 2/8/13), 156 So.3d 46, 50, an eyewitness viewed pictures of the defendant on the internet prior to viewing a photographic lineup assembled by the police. This court concluded that the eyewitness’ action did not render the procedure used by police unconstitutionally suggestive or taint the identification of the defendant prior to and during trial because the jury was aware that the eyewitness had seen the defendant’s -photograph prior to identifying him in a lineup and then identified only the defendant in the police lineup.
|27In Perry v. New Hampshire, — U.S. -, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012), the United States Supreme Court explained that the dangers of identification testimony are ordinarily to be combated by the ’safeguards inherent in the criminal justice system, including the right to counsel and compulsory process and confrontation; reliability is determined by the finder of fact.' A pretrial determination of reliability by the court is required only where the identification results from impermissi-bly suggestive pretrial procedures arranged by the police. Id., — U.S. at -, 132 S.Ct. at 721 & n. 1, 724-728, 730. Specifically, the Court held:
When no improper law enforcement activity is involved, we hold, it suffices to-test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.
Id., — U.S. at -, 132 S.Ct. at 721.
In the case at bar, the jury was aware that Barton had viewed a group picture, which allegedly showed Dove, pri- or to her identifying him from the police lineup. The jury was also aware that the picture was not shown by law enforcement, and that in fact, the only person she did identify from the police photographic lineup was the-defendant. We also consider an identification procedure is not suggestive merely because a witness has previously seen a defendant’s photograph. See Gilmore, supra; State v. Carter, 15-99, p. 27 (La.App. 5 Cir. 7/29/15), 171 So.3d 1265, 1283.
Dove does not directly argue that the identification procedure was suggestive, but even if the argument were made, it would be without merit. If an identification is suggestive, the court must review the reliability of that | ^identification in accordance with the factors set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), to-wit: the opportunity of the witness to view the criminal at the time of the crime; the witness’ degree of attention; the accuracy of his prior description of the criminal; the level of certainty demonstrated at the confrontation; and the time between the crime and the confrontation. State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639.
In the present case, Barton watched Dove from the time he brandished a weapon while standing- next to ■ Charles to the moment Dove stood over her and Charles and shot Charles more than thirteen times in the back. Although the shooting occurred after dark, Barton’s and other trial testimony indicated that the area around the barbershop was well lit by an adjacent grocery store. Barton recalled she looked at the defendant prior to his pulling the hood of his jacket-.over his head; he did not wear a mask or otherwise cover his face to conceal his identity. She was able to supply the police with a description of the defendant. At the hearing on the motion to suppress the identification and at *112 trial, Barton testified that she was 100% certain of her identification of the defendant from the police photographic lineup that was presented to her eleven days after the shooting.
Considering the totality of circumstances, the photographic identification produced a reliable identification. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3

By his third assignment, Dove argues the trial court abused its discretion by allowing the state to introduce recordings of the defendant’s jailhouse r calls; Dove contends that the probative value of the calls was outweighed by the danger of unfair prejudice. Further, he complains: the calls contain statements of persons other than the defendant; were introduced for no purpose other than to cast him, his lafamily, and his friends as hardened gang members bent on murder; and the audio quality of the calls was poor and the language heard on the calls was confusing as to what was being said.
All relevant evidence is admissible, and evidence that is not relevant is not admissible. La. C.E. art, 402. La. C.E. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less, probable than it would be without the evidence.” A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse, of discretion. State v. Girard, 12-0790, p. 6 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 691.
 La. C.E. art. 403 states: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” “Unfair prejudice,” as' used in La. C.E. art. 403, means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one,’ ” Author’s Note (3), La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p, 380 (2011). A trial court is vested with much discretion in, determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Henry, 11-1137, p. 9 (La. App. 4 Cir. 10/24/12), 102 So.3d 1016, 1022.
A trial court’s ruling on the admissibility under La. C.E; art. 404 B(l) is reviewable under an abuse of discretion standard. See State v. Henderson, 12-2422, pp. 3-4 (La.1/4/13), 107 So.3d 566, 568; State v. Barnes, 11-1421, p. 15 (La. App. 4 Cir. 9/19/12), 100 So.3d 926, 936. A trial court’s ruling as to the relevancy of lanevidenee will not be disturbed absent a clear abuse of discretion. State v. Sanders, 12-0409, p. 14 (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 630. “A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” Girard, 12-0790, p. 6, 110 So.3d at 691.[3]
*113 The evidence in this case was overwhelmingly condemning. Barton, the victim who survived the shooting, testified she had no doubt in. her mind that Dove was the man she saw shoot Charles. She had an unobstructed view of the defendant’s face as he- walked toward Charles and ultimately stood over them as they lay on the ground, continuing to shoot Charles in his back until he was dead. In addition, Mr. Daniels, the other eyewitness to the shooting/testified that the area where the shooting occurred was well lit, and he was in close proximity to Dove as Dove shot and killed Charles. Mr. Daniels was unequivocal in his identification of the defendant as the man he saw murder Charles. In light of the evidence presented at trial, the guilty verdicts in this case are unattributable to the jailhouse calls. This assignment is without merit*

ASSIGNMENT OF ERROR NUMBER 4 AND DOVE’S PRO SE ASSIGNMENT OF ERROR NUMBER 1

In his final assignment, Dove contends his life sentence at hard labor -without the benefits of parole, probation, or suspension of sentence is unconstitutionally excessive considering that he was only sixteen years old at the time of the hi shooting. Further, Dove asserts pro se that the manner in which the Miller v. Alabama[4] hearing was conducted violated his' rights under due process of law!
In State v. Norah, 12-1194, p. 37 (La.App. 4 Cir. 12/11/13), 131 So.3d 172, 195, this court set out the standard of review for an excessive sentence:
Article I, Section 20 of the Louisiana Constitution of 1974 prohibits any law from subjecting a person to excessive punishment. The excessiveness of a sentence is a question of law reviewable by this Court under its appellate jurisdiction. See La. Const. Art. 5, 10. The Louisiana Constitution differs from the Eighth Amendment to the U.S. Constitution in its explicit prohibition of excessive sentences. This “deliberate inclusion by the redactors of the Constitution of a prohibition against excessive as well as cruel and unusual punishment broadened the duty of this court to review the sentencing aspects of criminal statutes.” State v. Baxley, 94-2982, p. 4 (La.5/22/95), 656 So.2d 973, 977. A sentence is constitutionally .excessive if “it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime.” State v. Davis, 449 So.2d 452, 453 (La.1984).
The prohibition against excessive sen- • tences requires review of statutory sentencing guidelines in relation to the particular offense and offender. See State v. Sepulvado, 367 So.2d 762, 766 (La.1979). “[Penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.” State v. Landry, 2003-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239. The range of discretion granted a sentencing judge in handing down a sentence fluctuates depending on the interactivity of the facts, of a. particular case, the permissible criminal sanctions, and the range of conduct prohibited by the particular criminal statute that the defendant is convicted of violating. See Sepulvado, 367 So.2d at 766. While a legislature’s determination of what is the appropriate minimum sentence for a particular offense should be afforded deference by the judiciary, courts may still deviate below the mandatory minimum sentence when “there is clear and *114 convincing evidence in the particular case before it which would rebut [the] presumption of constitutionality [of the [32sentencing scheme of the statute that forms the basis of sentencing as applied to this particular defendant].” State v. Johnson, 97-1906, p. 7 (La.3/4/98), 709 So.2d 672, 676.
A reviewing court should not set aside a sentence imposed by a trial court absent a manifest abuse of this discretion. See State v. Batiste, 2006-0875, p. 17 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 820 (emphasis added). Our sentence review should strive only to correct “abuses of sentencing power” by the district judge, Sepulvado, 367 So.2d at 767, and not to attempt to impose sentences that we deem more appropriate. See State v. Soraparu, 97-1027, p. 1 (La.10/13/97), 703 So.2d 608, 608 (per curiam). “[A] remand for resentencing is appropriate only when there appears to be a substantial possibility that the defendant’s complaints of an excessive sentence have merit.” Id., 97-1027 at p. 1; 703 So.2d at 608. (internal quotations and punctuation omitted). See also State v. Black, 98-0457, p. 9 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 892. [Emphasis in original],
In Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the United States Supreme Court held that the Eighth Amendment of the United States Constitution prohibits mandatory life sentences without the possibility of parole for offenders convicted of homicide who were under the age of eighteen at the time of the offense without consideration of mitigating favors such as mental retardation; diminished culpability; greater prospects for reform; lack of maturity; undeveloped sense of responsibility; recklessness; impulsivity; heedless risk-taking; vulnerability to negative influences, outside pressures from family and peers, limited control over one’s own environment; lack of ability to extricate oneself from horrific, crime-producing settings; character not well-formed as adults; traits less fixed; actions less likely to be evidence of irretrievable depravity; transient rashness; proclivity for risk; inability to assess consequences; impetuosity; neglectful and violent family background; emotional disturbance; immersion in violence; drug and alcohol use; family physical abuse; whether one was in foster lascare; suicide attempts; and irreparable corruption. Obviously, in articulating all of the foregoing possibilities, not every one of them will apply to each defendant; a trial court need not address or consider each of the possibilities in every ease unless reasonability obvious or specifically call to the attention of the court at the time of sentencing. Ultimately, one main consideration is that the “lengthiest possible incarceration is an ‘especially harsh punishment for a juvenile’ because he will almost inevitably serve ‘more years and a greater percentage of his life in prison than an adult offender.’ ” Id., 567 U.S. at -, 132 S.Ct. at 2466, citing Graham v. Florida, 560 U.S. 48, 71, 130 S.Ct. 2011, 2028, 176 L.Ed.2d 825 (2010).
In order to comply with the Supreme Court’s ruling in Miller, the Louisiana legislature enacted La.C.Cr.P. art. 878.1 and La. R.S. 15:574.4 E. See La. Acts 2013, No. 239, effective 1 August 2014.[5] Dove, *115 however, was sentenced before those statutes were enacted but after Miller was decided. Nevertheless, article 878.1 gives Louisiana courts guidance on what should be considered at a hearing | ^to determine whether a juvenile’s life sentence should be. imposed with or without parole eligibility.
In Montgomery v. Louisiana, — U.S. -, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), the United States Supreme Court held Miller must be applied retroactively to all cases where a mandatory life sentence without parole was imposed on an offender under the age of eighteen convicted of a homicide. That'is, “Miller requires that before sentencing a juvenile to life without parole, the sentencing judge must take into account ‘how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.’ ” Id., — U.S. at -, 136 S.Ct. at 733.
Thus, Dove “must "be given the opportunity to show [his] crime did not reflect irreparable corruption; and, if it did not, [his] hope for some years of life outside prison walls must be. restored.” Id., — U.S. at -, 136 S.Ct. at 736-737.[6]
At the sentencing hearing in this case, Dove’s former football and baseball coach, Dewalle Price, testified that he had known the defendant since the defendant was five years old and coached him until he was about eleven years old. Except for a period after Hurricane Katrina, Mr. Price said he saw the defendant almost daily at the playground. . Price described the defendant as having a laid back personality and being respectful. He never knew the defendant to be violent or involved in gang life or illegal activities.
The defendant’s mother, Ms. Dove, also testified on the defendant’s behalf at the sentencing hearing. She denied that the defendant had any curfew violations and said he was ⅛ good child, who was never in any trouble. He would never fight |a5with anyone and got “good” grades — C’s and D’s — in school. The defendant attended private school and resided with both of his parents. Ms. Dove said the defendant was not in a gang and was innocent of these crimes. Moreover, she accused the prosecution of convicting the defendant in spite of knowing he was innocent.
The presentence investigation report compiled on the defendant included three curfew violations, battery, and second degree battery arrests. In summation of the investigation, the report stated:
During the interview with [the defendant], it was apparent that he blatantly lied about the Incident which resulted in his arrest. [The defendant] does not show respect for the laws of the State of Louisiana nor does he respect law en- . forcement or... any authority figure as *116 evidenced by the ease in which he speaks untruths regarding his own actions. It is apparent that he knows what he has done is wrong, thus the reason.he feels the need to lie. [The defendant] does not show any remorse for his actions and fails to even acknowledge any wrongdoing on his part. He took one life, attempted to take another, and, in the process, almost killed a child....
While incarcerated in Orleans Parish Prison and on trial for murder, [the defendant] was, charged with the offense of Second Degree Battery. This crime was. committed in jail, which proves his lack of respect, and unwillingness to change his violent behavior —
Furthermore, [the defendant] is a member of a known violent gang in Algiers: the Black Flag. Mafia. In this gang, narcotics trafficking and violence, which includes murder, runs rampant without a second thought of the consequences. As a devout member of this gang, [the defendant] will continue to commit" heinous crimes if given the chance as he has himself stated.
In sentencing Dove, the judge noted:
... [T]he court ordered a pré-sen-tencing investigation and the court has considered the arguments set forth by counsel at this hearing, 'as well as the testimony presented by' the 'witnesses. While I am typically very sympáthétic to young people making mistakes given the Jack, of maturity, given, thej^fact that the brain doesn’t really ■ develop fully until age twenty-five and given so many circumstances that impact our youth, especially’in Orleans Parish and the State of Louisiana in terms of their lives on a daily'basis.
In this particular cáse, I' do think that this case is an unusual case. While [defense counsel] is .correct, that the law requires the court to consider mitigating factors, [the prosecutor] is also correct, that there, are a number of factors, which point to the fact that [defendant], you . have1 had opportunities that other youth in this city have not had by attending a private school, by having both, a mother and a father and by having the opportunities that you have had. Notwithstanding that, you made certain decisions . to impact the lives of two citizens in our .city, as well as their family members and friends forever and it’s a very serious issue. I do not see that you have taken this matter seriously. I do not sense that you have any remorse for your actions.
Based on the evidence that was presented during the trial, it is the court’s opinion that your actions did not come from — your ■ actions - were intentional, your actions were quite intentional, that your actions were direct and the decision that you made was as a result of _ foolishness, basically, that’s . going to lead you to a life of incarceration.
Considering the trial court’s broad discretion, the circumstances surrounding the crime, and mitigating and aggravating evidence in.the record, we find that a life sentence without parole is not. grossly out of ..proportion to the seriousness of the crime of second degree murder such that it shocks the sense of justice despite the fact the defendant in this case was sixteen years old at the time' he committed the offense.
Dove’s sentence was imposed after Miller v. Alabama was decided by the United States Supreme Court and after State v. Tate was decided by the Louisiana Supreme Court, but before the United State Supreme Court denied certiorari in Tate and before the effective date of article 878.1,
*117 We find no mandate that a juvenile defendant must have a comprehensive family interview; a prenatal history, investigation; a developmental history documented; a full medical history ascertained; a history of substance abuse |S7documented; a social history obtained; and/or a psychological evaluation completed before sentencing, although some or all of them might in the appropriate case be useful but not disposi-tive.
We find adequate evidence that the trial judge at sentencing took into account factors as set forth in Miller that might indicate Dove’s sentence should be with possible parole. We find the trial court did not abuse its discretion in sentencing Dove to imprisonment without parole, probation, or suspension of sentence, rejecting any right to a future parole.
The assignments of error are without merit.
DOVE’S PRO SE ASSIGNMENT OF ERROR NUMBER 2
In Dove’s final assignment of error, he complains that he was convicted of second degree murder by a less than unanimous jury, which, he asserts, is unconstitutional and a denial of his right to equal protection under the United States Constitution and the Sixth, Eight, and Fourteenth Amendment thereto, and La. Const. Art. I, §§ 13, 15, 16, and 20. Our state constitution (Art. I, § 17), statutory law (La.C.Cr.P. art. 782 A), and both federal and state jurisprudence (Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); State v. Bertrand, 08-2215, 08-2311, pp. 6-7 (La.3/17/09), 6 So.3d 738, 742; State v. Curtis, 11-1676, p. 23 (La.App. 4 Cir. 3/13/13), 112 So.3d 323, 335) have upheld this, procedural device, that a less than unanimous jury (ten of twelve jurors) is sufficient to convict a person for second degree murder.
This assignment of error is .without merit. .
CONCLUSION
Based upon the foregoing, we affirm the convictions of David D. Dove for second degree murder and attempted second degree murder. David D. Dove’s IssSentences to- life without benefit of parole, probation of suspension of sentence for second degree murder and to thirty-five years without parole, probation, or suspension of sentence for attempted second degree murder is affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
DYSART, J., concurs in the result.

. Throughout the trial, the deceased is referred to interchangeably as Jacquain, Jacque, and Jacques. His mother said his name was Jacquain, so that is spelling of his name used herein.

. In his first assignment of error, Dove raises the issue of the unreliability of the identifications made by the two eyewitnesses to these shootings. The reliability of the' witnesses’ identifications are addressed in Assignment of Error Number 2 below.

. This court attempted to obtain the recordings of the telephone calls and/or the transcripts of those calls, but that evidence was not in the property room at the trial-court, Nevertheless, even if that evidence was improperly admitted, it is subject to a harmless error analysis as to admissibility. See State v. Ard, 08-1440, p. 8 (La.App. 4 Cir. 6/17/09), 15 So.3d 1166, 1170, For an error to be harmless, it must be shown beyond a reasonable doubt that the complained-of error did not contribute to the verdict. Chapman v. California, 386 U.S, 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The guilty verdict actually rendered in the trial must be unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)

. 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

. Addressing whether a juvenile offender’s life sentence should be imposed with or without parole, La.C.Cr.P. art. 878.1 states:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior *115 to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).5
At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender’s level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the , worst cases.
Conversely, La. R.S. 15:574.4 E applies only if the juvenile offender is sentenced to life imprisonment with the benefit of parole.

. We find that Montgomery overruled State v. Tate, 12-2763 (La.11/5/13), 130 So.3d 829, 833, cert. denied, — U.S. -, 134 S.Ct. 2663, 189 L.Ed.2d 214 (2014). Tate held Miller was .not retroactive.