WHIPPLE, C.J.
| ¡.The defendant, G’Quan Baker, was charged by grand jury indictment with three counts of second degree murder, violations of LSA-R.S. 14:30.1 (counts 1, 3, and 4), and one count of attempted second degree murder, a violation of LSA-R.S. 14:27 and LSA-R.S. 14:30.1 (count 2). After the defendant pled not guilty, a sanity commission was ordered, which found him competent to stand trial. A motion to quash the indictment was filed in light of the United States Supreme Court’s recent ruling in Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).[1] The trial court, however, denied the motion. Following a jury trial,[2] he was found guilty as charged on all counts. A motion to stay sentencing was filed by the defendant in light of Miller. In a previous writ application, this court ruled that the trial court erred in staying the defendant’s sentencing indefinitely, and the- matter was remanded to conduct a sentencing hearing in accordance with Miller.[3] On remand, for counts 1, 3, and 4, the defendant was sentenced to life imprisonment at hard labor, with eligibility for parole consideration after thirty-five years; and for count 2, he was sentenced to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence. The trial court ordered all sentences to run concurrently with each other, and the defendant was given credit for time served. He now appeals, urging one counseled assignment of error and three pro se assignments of error. For the following reasons, we affirm the defendant’s convictions and sentences on all counts.

\ STATEMENT OF FACTS

On the night of June 29, 2011, Angela Jarvis was driving home to the Elmgrove Garden Apartments in Baton Rouge. Her friend, Ashley London, age 19, was in the front passenger seat. Along the way back to the apartment, Angela noticed an older model SUV traveling in the opposite lane, and the two drivers looked at each other before Angela continued her drive home. As she turned right onto Fairchild Street, Angela looked in her rearview mirror, and noticed the SUV had turned around and was following her. When she pulled into a parking space at the apartment complex, someone from the SUV fired a gunshot into the back window of Angela’s vehicle. Eventually, an individual (later identified as the defendant) exited from the front passenger seat of the SUV, allowing Ange *564 la to observe his face through the driver’s-side mirror of her vehicle. In the meantime, Ashley attempted to exit the car, but the defendant approached and shot her. Angela heard the driver of the SUV tell the defendant to “[g]et both of them.” Angela “played dead” and remained as motionless as possible. The defendant ultimately left without shooting her. However, Ashley sustained two gunshot wounds, and eventually died as a result of a perforated left lung and heart.
Angela later spoke with the police at the Violent Crimes Unit. She described the gunman as being younger than the driver and “dark skinned.” In the weeks that followed the murder, Baton Rouge City Police Homicide Detective Chris Rudy presented Angela with three photographic lineups, but each time she was unable to identify the shooter.
On the day after the Elmgrove Garden Apartment shooting, Detective Rudy spoke with Dedrick Watson, a witness to the shooting. Watson informed Detective Rudy that he was sitting on his back balcony, when he noticed a white Jeep pull in behind Angela’s vehicle. Watson informed Rudy that “he came out shooting.” 14Watson stated that during this time, Angela was standing outside of her vehicle, and then ran inside her house when the shooting began. Next, Watson heard the driver of the white vehicle say “[l]et’s go,” the shooter returned to the vehicle, and the two left. However, Watson was unable to provide any details regarding the identity of the shooter.
On the early morning of July 29, 2011, detectives with the Baton Rouge City Police Department responded to a crime scene near the 9100 block of Kingfisher Avenue. Upon their arrival, detectives found a Ford Explorer near the railroad tracks. Inside the vehicle, which was still running, were Jessica Parker, age 25, in the driver seat, and Kevin Bowie, age 32, in the front passenger seat, both dead from multiple gunshot wounds. Each victim was shot multiple times. Jessica was shot six times to her head, neck, and extremities, while Kevin was shot eleven times to his head and neck. At least nine spent casings were found in the Explorer, eight of which were 9mm caliber and one which was a .25 auto caliber.
Detective Elvin Howard of the Baton Rouge City Police Department homicide division was the lead detective at the scene and located a potential witness, Robin Johnson. After speaking with Johnson, the defendant was identified as a suspect in the Kingfisher Avenue murders. Detective Howard later received a tip that the murder weapon was sold to a juvenile named Darion Burkes in Pointe Coupee Parish. Detective Howard was eventually able to retrieve the weapon, a Ruger P85 9mm pistol.
Detective Howard also learned that the defendant was due for a random drug test at the juvenile detention center. The defendant was picked up by two other Baton Rouge City Police Homicide detectives, and was subsequently transferred to the parish prison for booking before being sent to the juvenile detention center. The retrieved 9mm casings were all traced to the Ruger P85 pistol sold to Burkes.
| ¿Robin Johnson was a friend of the defendant and allowed him to stay at her house. On July 28, 2011, Robin was with the defendant and his brother, Preston Nelson. At approximately 10:00 p.m., the two dropped her off at her home and left in a white Ford Explorer. The next time Robin saw the two was the next morning around 3:30 a.m. Robin indicated that when they returned, both the defendant and Nelson had guns and Robin indicated that “G’Quan was smiling.” Specifically, the defendant had a 9mm [handgun], and *565 upon his return to Robin’s house, he “[p]ut [the 9mm handgun and Nelson’s gun] on the table and cleaned them off.” The defendant and Nelson then left, but Robin spoke with the defendant on the following Saturday. The defendant explained to Robin that they gave Kevin Bowie three Xanax bars and that “they got him.” The defendant admitted to Robin that he was riding in the car with Kevin Bowie, who was in the front seat, and that he killed Kevin Bowie. Lastly, Robin identified the Ruger handgun as the one she saw the defendant with on July 29, 2011.
Detective Howard provided Detective Rudy information about the defendant being a possible suspect in the murder of Ashley London. Detective Rudy then presented Angela with a photographic lineup which included the defendant’s picture, and she identified him as the SUV passenger and shooter. Additionally, through another photographic lineup, she was able to identify Preston Nelson as the driver of the SUV.[4] Detective Rudy then arrested both suspects.

COUNSELED ASSIGNMENT OF ERROR NO. 1

In his sole counseled assignment of error, the defendant claims that the trial court erred in denying his motion to quash the indictment. Specifically, he argues that the United States Supreme Court’s ruling in Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 2475, 183 L.Ed.2d 407 (2012) declared the mandatory penalty | ^provision found in LSA-R.S. 14:30.1[5] invalid and, therefore, he, as a juvenile, could not be sentenced to life in prison as an adult without the possibility of parole for second degree murder in district court.
In Miller, the United States Supreme Court held that the Eighth Amendment forbids a sentencing scheme which mandates life in prison without possibility of parole for juvenile offenders. Miller does not, however, establish a prohibition against life imprisonment without possibility of parole for juvenile homicide offenders in every case, but rather requires a sentencing court to consider the offender’s youth and attendant characteristics as mitigating circumstances before deciding to impose the harshest possible penalty for juveniles. Miller, — U.S. -, 132 S.Ct. at 2467-69; State v. Graham, 2011-2260 (La.10/12/12), 99 So.3d 28, 29 (per curiam). Citing Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (“A State is not required to guarantee eventual freedom,” but must provide “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.”), the Miller Court stated that too great- a risk of disproportionate punishment is created by making youth irrelevant to imposition of the harshest prison sentence. Miller, — U.S. -, 132 S.Ct. at 2469. The Court further indicated that the Graham decision was sufficient to decide the case, and it did not consider the alternative argument that a categorical bar on life without parole for juveniles was required. Miller, — U.S. -, 132 S.Ct. at 2469. The Court further held that although it was not foreclosing the sentencer’s ability to make that determination in homicide cases, it did require the trial court to take into account how children are different, and how those differences coun *566 sel against irrevocably sentencing them to a lifetime in prison. Miller, — U.S. at -, 182 S.Ct. at 2469. Following Miller, the Louisiana legislature enacted LSA-C.Cr.P. art. 878.1 and LSA-R.S. 15:574.4(E), both of which provide procedural guidelines for parole eligibility regarding offenders who commit first or second degree murder when they are under the age of eighteen years.
Statutes are presumed to be valid and the constitutionality of a statute should be upheld whenever possible. State v. Thomas, 2004-0559 (La.1/19/05), 891 So.2d 1288, 1235. In the instant case, the defendant attempts to impermissibly extend Miller’s holding. Contrary to his allegations, Miller does not invalidate LSA-R.S. 14:30.1, nor does it' prohibit prosecution or deprive the district court of its jurisdiction over an offender under the age of eighteen years. Instead, Miller’s sole holding was to prohibit a “sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders” without first considering certain attendant and mitigating characteristics. Miller, — U.S. -, 132 S.Ct. at 2469.
As noted by the Louisiana Supreme Court:
Miller deals exclusively with sentencing and does not pertain to criminal trial procedures leading to conviction. It focuses solely on accuracy in sentencing and does not address or impinge on the accuracy of a juvenile defendant’s conviction for a homicide offense.
State v. Tate, 2012-2763 (La.11/5/13), 130 So.3d 829, 840, cert denied, — U.S. -, 134 S.Ct. 2663,- 189 L.Ed.2d 214 (1014).
Moreover, if Miller invalidated the penalty provision found in LSA-R.S. 14:30.1, our Louisiana Supreme Court has previously held that the invalidation of a penalty provision does not render an entire statute unconstitutional. In State v. Drew, 360 So.2d 500, 507-08 (La.1978), cert denied, 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1979), the Louisiana Supreme Court held that, although the death sentence was excessive punishment for aggravated rape in light of the United |sStates Supreme Court’s decision in Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the invalidity of the death penalty provision “does not render invalid the entire statute.” Furthermore, in State v. Burge, 362 So.2d 1371, 1375 (La.1978), the defendant argued that his allegedly unconstitutional aggravated rape and aggravated kidnapping penalties should preclude a juvenile from being tried in district court in light of Coker. The Louisiana Supreme Court denied the defendant’s contention, stating that “we have consistently held that although the death penalty may be unconstitutional, the prosecution for the offense is nonetheless valid.” Burge, 362 So.2d at 1375. While these cases concern the death penalty, their principle and rule of law apply to the instant case. Therefore, even though Miller may have invalidated the penalty provision found in LSA-R.S. 14:30.1, the State continued to have the right to prosecute the instant defendant in district court pursuant to Article 305 of the Louisiana Children’s Code.
With regard to the issue of sentencing, the Miller Court enumerated the individual circumstances of a juvenile defendant which would be pertinent for consideration by a sentencing court: consideration of his chronological age and its hallmark features — among them immaturity, impetuosity, and failure to appreciate risks and consequences; the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional; the circumstances of the offense, including the extent of his participation in the conduct and the way familial and peer *567 pressures may have affected him; whether he might have been charged and convicted of a lesser offense if not for incompeten-cies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation when the circumstances suggest it. See Miller, — U.S. at -, 132 S.Ct. at 2468.
|flOn remand from this court, the trial court, noting its obligation to comply with Millet’s mandates, and after reviewing the previously ordered pre-sentence investigation report, stated:
In essence, the court is required to balance two theoretical measures of sanction and punishment, that of the juvenile standards of sanction, as well as that of an adult standard. In its ascertainment of an appropriate sentence, I have reviewed for this record the following code provisions of Louisiana law: the Louisiana Code of Criminal Procedure Article 879, regarding determinant sentencing factors; the Louisiana Code of Evidence; the Louisiana Code of Criminal Procedure Article 894.1, sentencing guidelines and recommendation; Louisiana Children’s Code Article 901, Dispositive or Disposition Guidelines; and various literature to include a recent publication by writers of Visser and Shook. This is a journal article entitled [“jSupreme Court’s Emerging Jurisprudence on the Punishment of Juveniles: Legal and Policy Implications.!”] I have further reached this conclusion, I have weighed the following evidence presented at this hearing, which was recessed to afford the defendant additional opportunity to put on further mitigating mental health issues before the court. I have considered the following factors: the defendant’s age at the time of the commission of [the] offense; his childhood circumstances; his family circumstances; I have considered the significant history and the weight of the mental health evidence that was presented; I have listened attentively to the victims’ family, each and every one of them; I have listened to the testimony of the Honorable Judge Pam Taylor Johnson of the juvenile court; the medical testimony of the witnesses; and the record that was established before me. All of the evidence that I have heard adduced at this hearing supports that G’Quan Baker came to us as a crack baby. His mother is largely responsible, directly, for his health, and what Judge Johnson concluded amounted to a child who, at the age of 14, had become a ticking time bomb. And the only thing that we can concern [sic] with was that he would, at some point in time, explode, and he did just that. He exploded into the lives of these families with such violent conduct and actions that, in most instances, would warrant the most severe punishment that the law prescribes. Our law has determined that the execution of a person for this age and .conduct is not contemporary with today’s philosophical approach toward American values.
|inOn counts 1, 3, and 4, the trial court sentenced the defendant to life imprisonment at hard labor, and stated, “[t]he defendant is eligible for parole consideration after 35 years.” On count 2, the trial court sentenced the defendant to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence. The court ordered that the sentences run concurrently with each other. The defendant concedes he was sentenced in accordance with , Miller. Further, after a complete review of the record, we find the trial court fully complied with the requirements *568 set forth in Miller, as well as LSA-C.Cr.P. art. 878.1 and LSA-R.S. 15:574.4(E).
For the foregoing reasons, this assignment of error lacks merit.

ORIGINAL AND SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR NO. 1

In his first pro se assignment of error, the defendant argues that he is being denied a proper judicial review based on a complete record pursuant to Louisiana Constitution Article I, Section 19, because the transcript 'reflecting the jury voir dire proceedings was not included in the record. He references minute entries indicating certain challenges for cause were denied, and complains that the record as constituted presents no reason for those denials.
A criminal defendant has a right of appeal based on a complete record of all evidence upon which the judgment is based. See La. Const. art. I, § 19; see also State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 586, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). Additionally, in felony cases, the clerk or court stenographer is required to record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel. See LSA-C.Cr.P. art. 843.
In After the filing of the defendant’s first pro se brief, this court ordered that the appellate record be supplemented with the transcript of the jury voir dire conducted on September 10, 2012. Given that supplementation of the record has occurred herein, this assignment of error is now moot.[6]
After the defendant received the supplemental jury voir dire transcript, he was given an extension of time to file a supplement to his pro se brief. In his supplemental brief, he again claims he was denied a proper judicial review because the jury verdict sheets were not made a part of the record. (Supp. Pro Se Brief, p. 2). This argument lacks merit because the jury verdict sheets are included in the record on pages 90-97.
Lastly, the defendant claims he was denied a proper judicial review because the “actual defense voir dire” transcript of one of the potential jurors is missing from the record. (Supp. Pro Se Brief, p. 1). Again, this argument lacks merit, because an extensive colloquy was held between the trial court, defense attorney, prosecutor, and prospective juror, which is contained on pages 779-82 and 791-95 of the supplemental jury voir dire transcript.
For the foregoing reasons, this assignment of error has been rendered moot or otherwise lacks merit.

PRO SE ASSIGNMENT OF ERROR NO. 2

In his second pro se assignment of error, the defendant claims that the trial court did not find him competent to stand trial, and therefore, the court lacked proper jurisdiction.
Louisiana Code of Criminal Procedure article 642 provides, in pertinent part, that “[w]hen the question of the defendant’s mental incapacity to proceed is raised, | T ¡.there shall be no further steps in the criminal prosecution, except the institution *569 of prosecution, until the defendant is found to have the mental capacity to proceed.”
This assignment of error is without basis in the record. The minute entry dated May 7, 2012 reflects that a sanity hearing was held, with both the State and defense counsel stipulating to the doctor’s report. Thereafter, the defendant was found competent to stand trial. Furthermore, we have examined the sanity commission doctor’s report, which concluded that the defendant was competent to proceed to trial. The trial court determined that the defendant was competent to stand trial, and therefore, this assignment of error is without merit.

PRO SE ASSIGNMENT OF ERROR NO. 3

In his third pro se assignment of error, the defendant argues his appellate counsel was ineffective for preparing an appeal based on an incomplete record and for assigning only one error. Specifically, he alleges that his appellate counsel should have raised his pro se assignments of error numbers 1 and 2 in the counseled brief.
A claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396, 411, cert. denied, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001). A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that his attorney was ineffective, the defendant must first show that the attorney’s performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. Washington, 104 S.Ct. at 2065. Secondly, the defendant must prove that the deficient performance prejudiced the |isdefense. This element requires a showing that the errors were so serious that the defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted. Washington, 104 S.Ct. at 2067. It is not sufficient for defendant to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that but for the counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Washington, 104 S.Ct. at 2067-2068. Further, it is unnecessary to address the issues of both counsel’s performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components. State v. Serigny, 610 So.2d 857, 859-60 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1263 (La.1993).
All of the deficiencies alleged by the defendant on appeal address matters of preparation and strategy. Decisions relating to investigation, preparation, and strategy require an evidentiary hearing[7] and, therefore, cannot possibly be reviewed on appeal. State v. Allen, 94-1941 (La.App. 1st Cir.11/9/95), 664 So.2d 1264, 1271, writ denied, 95-2946 (La.3/15/96), 669 So.2d 433. Furthermore, when the substantive issue that an attorney has not raised has no merit, then the claim that the attorney was ineffective for failing to raise the issue also has no merit. State v. Williams, 613 So.2d 252, 256-57 (La.App. 1st Cir.1992).
*570 For these reasons, this assignment of error is without merit or otherwise not subject to appellate review.

REVIEW FOR ERROR

The defendant also requests that this court examine the record for error under LSA-C.Cr.P. art. 920(2). This court routinely reviews the record for such errors, whether or not such a request is made by a defendant. Under LSA-C.Cr.P. |14art. 920(2), we are limited in our review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. After a careful review of the record in these proceedings, we have found no reversible errors. See State v. Price, 2005-2514 (La.App. 1st Cir.12/28/06), 952 So.2d 112, 123-25 (en banc), writ denied, 2007-0130 (La.2/22/08), 976 So.2d 1277.
CONCLUSION
For the above and foregoing reasons, the defendant’s convictions and sentences are affirmed on all counts.
CONVICTIONS AND SENTENCES AFFIRMED ON ALL COUNTS.

. The defendant was sixteen years old at the time of the commission of the crime.

. The defendant initially filed a motion to waive trial by jury. However, the record is devoid of a signed order or further action taken on the motion. The defendant was subsequently tried by a jury of twelve.

. State of Louisiana v. G’Quan Baker, 2013-0024 (La.App. 1st Cir.3/25/13) (unpublished writ action).

. Angela also made an in-court identification of the defendant at trial as the individual who got out of the passenger side of the STJV and shot Ashley.

. Louisiana Revised Statute 14:30.1(B) provides that "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."

. Indeed, the voir dire transcript, consisting of 198 pages, is available to the defendant upon request.

. Moreover, the defendant would have to satisfy the requirements of LSA-C.Cr.P. art. 924 et seq., in order to receive such a hearing.