EDWARDS, JUDGE PRO TEMPORE, J.
Defendant, Dexter Allen, appeals his convictions and sentences for two counts of second degree murder and 21 counts of simple burglary. For the reasons that follow, defendant's convictions are affirmed, and his life sentences for his second degree murder convictions, without benefit of parole, probation, or suspension of sentence, are affirmed. We remand this matter to the district court for the imposition of determinate sentences for defendant's simple burglary convictions.
PROCEDURAL HISTORY
On July 30, 2015, a Jefferson Parish Grand Jury indicted defendant, Dexter Allen, on two counts of second degree murder (counts one and two), violations of La. R.S. 14:30.1, and 21 counts of simple burglary (counts five through 23), in violation *181 of La. R.S. 14:62.[1] Defendant pled not guilty at his arraignment on September 11, 2015. On October 11, 2016, the matter proceeded to a jury trial, at the conclusion of which on October 17, 2016, defendant was found guilty as charged on all counts. On November 16, 2016, defendant filed a Motion For Funds To Conduct Mitigation Investigation, for the purpose of hiring a juvenile mitigation specialist ahead of defendant's constitutionally mandated sentencing hearing under Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). After a hearing on December 5, 2016, the trial court denied defendant's request for funding. Defendant thereafter requested a continuance of his sentencing, which the trial court granted on March 6, 2017. On March 26, 2017, defendant filed a second motion for funds to hire an expert to "develop evidence in mitigation" in advance of his Miller hearing. On April 5, 2017, the trial court denied defendant's second request for funds, and he filed a writ to this Court seeking supervisory review of that ruling, which was denied. State v. Allen , 17-199 (La. App. 5 Cir. 4/18/17) (unpublished writ), writ denied , 17-0640 (La. 6/29/17), 222 So.3d 48. On April 20, 2017, defendant filed a motion for new trial, which was denied on that same date. Also on that date, defendant's Miller hearing was held, and the trial court continued sentencing.
On April 21, 2017, the trial court sentenced defendant to life in prison without benefit of parole, probation, or suspension of sentence for counts one and two, and two years on each count, five through 23, with each two-year sentence to run concurrently. Defendant's motion for reconsideration of sentence was denied following a hearing on August 22, 2017. This appeal follows.
FACTS
On April 22, 2015, officers from the Jefferson Parish Sheriff's Office were dispatched to 3717 Clifford Drive in Metairie in response to a 9-1-1 call made by Elizabeth Branley Pence reporting that she had found her husband, David Pence, and her son, Nicholas Pence, shot dead in their home. Sergeant David Roddy was the first officer on the scene; he entered the home through the open glass storm door on the side of the house. He described that it was "foggy" inside the house and immediately noticed the smell of gunpowder. He found two deceased victims with apparent gunshot wounds, David Pence seated in a chair and Nicholas Pence on the ground. After he and other officers cleared the house-making sure the suspect was no longer present-he returned to the living room and spoke with Ms. Pence, who was covered in blood as a result of performing C.P.R. on her son. Officers from Jefferson Parish Sheriff's Office Crime Scene spent several hours recovering physical evidence from the scene, notably, four 12-gauge shotgun shells as well as lead-like projectiles; a gun was not recovered.
While on the scene that night, officers canvassed the neighborhood to speak with people to see if anyone heard or saw anything. As a result, they became aware of several car burglaries in the area. Additionally, officers discovered that one of the vehicles at the Pence home, a black Mustang, had also been burglarized. Deputy Christie Babineaux was one such officer canvassing the neighborhood that evening, and while driving on Ridgeway Drive, a neighboring street, she observed an Audi with its trunk open. She spoke with the *182 owner of the vehicle, Shawn Suggs, who indicated that nothing appeared to be missing, but noticed a visible palm print on the driver's side window. Captain Chad Pitfield, who was initially at the crime scene at the Pence home, went to the scene on Ridgeway and was able to successfully lift the print from the Audi. Officers also were able to recover surveillance video from homes in the neighborhood. Detective William Roniger, the lead detective in the homicide case, was informed of the series of vehicle burglaries in the neighborhood surrounding the Pence home and thought the murders and the burglaries were related.
Surveillance video from John Hennessey's home at 3625 Clifford Drive depicts a black male approaching his wife's Porsche Cayenne parked in the driveway, lifting the vehicle's door handle, and then walking away. Later on in the video, a set of feet, that came from the direction of where the subject walked, returned to the view of the camera. At a later point, the video depicts something falling to the ground where the feet were. Later, a purse belonging to one of the victims of the car burglaries was found in that location. The feet come back into camera view later from the direction of the Pence home.
Detective Roniger spoke with Christopher Meyer and Alex Underwood, friends of Nicholas Pence, who were at the Pence house earlier the evening of April 22, 2015. Mr. Meyer and Mr. Underwood were at the Pence home with Nicholas, hanging out in the garage with three other friends after their flag football game; they indicated they left around 11:40 p.m. Mr. Underwood testified that as he was leaving the Pence home, he noticed a white Toyota Highlander coming down the street with no headlights on that "pulled off to the opposite side of the street for a brief moment," then stopped and started traveling back down the street, but then changed directions. Further depicted in the surveillance video was a white Toyota Highlander with no headlights on, driving toward the Pence home around the time of the murders. Other surveillance video from Kathryn Fitzpatrick's home at 4000 Ridgeway Drive depicts the same white Toyota Highlander traveling southbound on Ridgeway Drive toward West Esplanade Avenue, which is near the on-ramp to I-10 East at Bonnabel Boulevard. Detective Roniger testified regarding the likely path of travel from the Pence home to the I-10 East ramp at Bonnabel as the Automated License Plate Recognition System (A.L.P.R.) captured a Toyota Highlander, bearing the license plate YCB-052, getting on I-10 East at 11:56 p.m. After getting this information, he investigated the vehicle and discovered that it had been reported stolen in a carjacking by the owner, Shalacia Leflore, earlier on April 22, 2015. Detective Roniger also discovered that the fingerprints that were taken from the Audi on Ridgeway Avenue belonged to a person named Haraquon DeGruy.
Based on this information, he contacted Detective Pat DiGiovanni to employ the U.S. Marshals Task Force to locate Haraquon DeGruy as well as the Toyota Highlander. Detective DiGiovanni eventually located Ms. DeGruy at an apartment complex in New Orleans East, as well as the Toyota Highlander, which was found parked nearby. Detective DiGiovanni decided to surveil the Highlander as they did not know the number of the apartment in which Ms. DeGruy was located. Ultimately, during the day on April 24, 2015, officers who were monitoring the Highlander observed it on the move. Officers followed the vehicle, which was traveling at an extremely low rate of speed, which indicated to the officers that the person in the Highlander knew he was being followed.
*183 The officers decide to "trap" the Highlander, that is, position their vehicles in front and behind the subject vehicle to prevent it from moving. Officers in the vehicle behind the Highlander activated its lights and sirens, and officers, who were wearing the U.S. Marshal tactical vest, exited the vehicles, announced their presence as police, and approached the Highlander with guns drawn. As they approached the Highlander, the vehicle turned right to escape the trap, nearly striking Detective Harley Smith, who jumped out of its path in order not to be hit. A high-speed chase of the Highlander ensued, which ended up on the I-10 Highrise Bridge, after the Highlander struck another vehicle. The driver of the Highlander, who was later identified as defendant, Dexter Allen, exited the vehicle and began to flee on foot. After an extensive foot chase, officers ultimately found defendant hiding in the Industrial Canal, and he was taken into custody. The passenger of the vehicle, Haraquon DeGruy, was also apprehended.
Defendant, as he was involved in a car crash, was transported to a nearby hospital to be cleared before being transported to prison. Detective David Deroche, the lead investigator of the vehicle burglaries, arrived at the hospital and noticed defendant staring at his badge, which he was wearing on his belt next to his gun. Detective Deroche described that when he first arrived at the hospital, defendant seemed "not concerned, playful, smiling a lot," but when defendant spotted his badge, his demeanor changed to "more serious." Since Detective Deroche did not want to alert defendant he was suspected in the homicides and wanted him to be relaxed, he informed him that he was a "burglary detective from Jefferson Parish...investigating some door pulls" and that defendant had "some more serious things to worry about concerning that car [defendant was] driving." After Detective Deroche said that, he described that defendant looked away and smiled and returned to his previous demeanor.
The Toyota Highlander was later processed by the Jefferson Parish Crime Lab. Items that were stolen from the burglarized vehicles were located in the Toyota Highlander. Latent fingerprints were also taken from the exterior of the Highlander, which matched both defendant and Ms. DeGruy. Detective Thomas Gai, who participated in the processing of the Highlander, explained that relative to the homicide investigation, he was looking for several items he knew were taken from inside of the Pence home, in addition to items that would be pertinent to the burglary investigation. Importantly, a CVS card belonging to David Pence was found inside of the Highlander, which through Ms. Pence, the detectives knew was taken from her purse inside the home at the time of the murders. A search warrant was obtained for defendant's home at 2227 Arts Street in New Orleans. Deputy Gabriel Faucetta assisted in the search of defendant's home. He testified that the home was a "raised shotgun," and as he was looking underneath the home, he located a shotgun on top of one of the floor rafters. Deputy Ryan Singleton, a crime scene technician, retrieved the 12-gauge Mossberg shotgun from underneath the house. He explained that he found one spent shotgun shell and three live rounds still inside the gun. Detective Gai explained that the spent shotgun shell was significant as he knew from ballistics inside the Pence home that there were five shells that were fired at the time of the murders, but only four were recovered from the home. From inside of the home, other items consistent with those that were stolen in the burglaries were recovered, as well as items belonging to *184 the victim of the carjacked Toyota Highlander.
Deputy Singleton also explained he swabbed the shotgun for DNA; analysis showed that the DNA profile from the swab of the shotgun's stock, trigger guard, and grip was a mixture of a major and minor contributor and that defendant's DNA was consistent with the DNA for the major contributor. Ballistics analysis further showed that all the spent shotgun shells recovered from the Pence home, as well as the one that was recovered from inside the shotgun, were fired by the 12-gauge Mossberg shotgun that was recovered from defendant's home.
Detective Gai and Detective Roniger obtained an arrest warrant for defendant for the murders of David and Nicholas Pence and interviewed defendant while he was in custody at Orleans Parish Prison. Detective Gai described that during the beginning of the interview defendant "didn't seem too very worried," but later his demeanor changed, and "he appeared to be more worried and scared regarding specifically questions of the homicide at 3717 Clifford." In his statements, defendant indicated he committed the vehicle burglaries; however, he denied involvement in the murders.
LAW AND ANALYSIS
In his first assignment of error, defendant contends that the trial court violated his Eighth Amendment right against excessive punishment when it failed to authorize the appropriate funding for defense counsel to secure experts who would research and compile all relevant mitigating factors on Allen's behalf in preparation of the Miller hearing.
As noted above, defendant previously sought supervisory review from this Court after the trial court denied defendant's second request for funds to hire an expert in advance of his Miller hearing. In finding no error in the trial court's denial for expert funding at that time, we reasoned:
Defendant was seventeen years old at the time of the offenses. Thus, he is clearly entitled a hearing pursuant to Miller v. Alabama , supra , and La. C.Cr.P. art. 878.1 to determine whether the mandatory life sentence for his second degree murder convictions should be imposed with or without parole eligibility. La. C.Cr.P. art. 878.1(B) sets forth factors to be considered at the sentencing hearing and provides as follows:
At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender's level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
In this case, defense counsel is requesting funding, citing to various constitutional articles and State v. Touchet , 93-2839 (La. 9/6/94), 642 So.2d 1213, to conduct a proper Miller hearing and to allow him to employ a mitigation investigator, a fact investigator, a psychologist, an expert in trauma, and a prison adjustment expert.
In State v. Touchet , supra at 1221-1222, the Louisiana Supreme Court discussed expert funding as follows:
At the hearing on expert funding, whether ex parte or contradictory, the defendant must first show a need for the funding. The defendant must show with *185 a reasonable degree of specificity what type of expert is needed and for what purpose. In other words, the indigent defendant requesting governmental funding for the securing of expert assistance must show that it is more likely than not that the expert assistance will be required to answer a serious issue or question raised by the prosecution's or defense's theory of the case. If the defendant meets this burden, then the court is to order that the funds be provided by the state. If the defendant fails to meet this burden, and the proceedings were held ex parte, both the written reasons for denial and the record of the proceedings are to remain under seal during the pendency of the defendant's prosecution, including appellate review.
We first note that relator has not made the required showing under State v. Touchet to support his request for funding. At this point, relator's request is based on speculation as to what, if anything, the experts might find to be a mitigating factor in sentencing. As noted by the trial court at the April 5, 2017 hearing, "it's still a fishing expedition because you don't know if appointment of these experts would be of any benefit at this time." Moreover, the trial court's denial of relator's request for funding does not deny relator a meaningful opportunity to present mitigating evidence at the sentencing hearing. In fact, the trial court informed defense counsel as follows: "I mean, if you want to, you know, in your argument to the Court discuss his background and, you know, his history and bring those issues to light to the Court, that's an adequate opportunity to tell his story and present his claim fairly." In State v. Dove , 15-783 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, 117, the Fourth Circuit, in discussing the evidence considered at the sentencing hearing stated:
We find no mandate that a juvenile must have a comprehensive family interview; a prenatal history investigation; a developmental history documented; a full medical history ascertained; a history of substance abuse documented; a social history obtained; and/or a psychological evaluation completed before sentencing, although some or all of them might in the appropriate case be useful but not dispositive.
State v. Allen , supra .
Under the doctrine of the "law of the case," an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. State v. Burciaga , 05-357, p. 5 (La. App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128. The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson , 06-859, p. 12 (La. App. 5 Cir. 4/11/07), 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite relitigation of the same issue; but it will not be applied in cases of palpable former error. Id. The prior denial of supervisory writs does not preclude reconsideration of an issue on appeal, nor does it prevent the appellate court from reaching a different conclusion. State v. Castleberry , 98-1388 (La. 4/13/99), 758 So.2d 749, 755, cert. denied , 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Reconsideration is warranted when, in light of subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis , 03-488, p. 6 (La. App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n.2, writ denied , 03-3401 (La. 4/2/04), 869 So.2d 874.
*186 By this assignment of error, defendant effectively seeks to have this Court reconsider its prior ruling. However, defendant has not presented any new evidence to indicate that the issue is now different, nor is any such difference evident from the record. Defendant was afforded a hearing pursuant to Miller v. Alabama, supra , and La. C.Cr.P. art. 878.1 to determine whether the mandatory life sentence for his second degree murder convictions should be imposed with or without parole eligibility. Defendant was provided a meaningful opportunity to present mitigating evidence at the sentencing hearing.[2] While defendant maintains that he should have been provided funds for a mitigation investigator, a fact investigator, a psychologist, an expert in trauma, and a prison adjustment expert for the purposes of conducting the Miller hearing, defendant's asserted reasons for seeking the assistance of those experts never developed beyond the level of speculation, and therefore never met the showing required under State v. Touchet , supra . Thus, defendant has failed to show that this Court should not follow the law of the case doctrine and decline to exercise its discretion to reconsider its prior ruling on this issue.
Accordingly, this assigned error is without merit.
In his second assignment of error, defendant argues that the trial court erred in not following a mandate in Miller for the "prosecution to carry its burden of showing that the sentence expressly mentioned in the statute is appropriate by showing that the aggravated factors outweigh all of the mitigating factors."
The record shows that on December 5, 2016, defendant filed a Motion to Require the State to Provide Notice of Intent to Seek a Sentence of Life without Parole and to Provide Notice of the Aggravating Factors It Intends to Rely on in Support of this Sentence. In the motion, defendant argued that because the sentencing phase of Miller cases had been analogized to capital penalty phases by the United States Supreme Court, the corresponding capital procedural protections must necessarily be incorporated in the Miller context. Defendant also filed a Motion for Evidence in Aggravation Including Notice of Jackson Evidence and Bernard Evidence, requesting disclosure of evidence of prior convictions or unadjudicated misconduct the prosecution contemplated producing at the penalty phase under Jackson .[3] He also sought disclosure of victim impact *187 evidence under Bernard .[4]
The State filed opposition to these motions, arguing that while Miller and other relevant United States Supreme Court jurisprudence drew analogies between the death penalty for adults and life without parole for juveniles, such analogies did not establish that a Miller hearing is the functional equivalent of a capital sentencing hearing. The State averred that none of the special concerns innate to capital sentencing should be construed as to apply in the context of Miller hearings.
The motions were heard on April 5, 2017, and were denied by the trial court, which found that "in light that this is not a capital case," Bernard and Jackson were "not applicable."
In State v. Brown , 12-0872 (La. 5/7/13), 118 So.3d 332, 335, the Louisiana Supreme Court acknowledged that "the Miller holding permits the imposition of a life sentence without parole but only after an opportunity to consider mitigating circumstances." See also State v. Baker , 14-0222, p. 7 (La. App. 1 Cir. 9/19/14), 154 So.3d 561, 566, writ denied , 14-2132 (La. 5/15/15), 170 So.3d 159 (stating that " Miller's sole holding was to prohibit a 'sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders' without first considering certain attendant and mitigating characteristics"); State v. Brooks , 49,033, pp. 6-7 (La. App. 2 Cir. 5/7/14), 139 So.3d 571, 576, writ denied , 14-1194 (La. 2/13/15), 159 So.3d 459 (finding that Miller does not create a categorical bar against life without benefit of parole for juveniles, "but a sentencing court must first consider an offender's youth and attendant characteristics as mitigating circumstances before determining whether to impose the harshest possible penalty for a juvenile offender"). As noted by the Louisiana Third Circuit in State v. Doise , 15-713 (La. App. 3 Cir. 2/24/16), 185 So.3d 335, 344 :
We find nothing in Miller that requires the trial court to consider certain factors prior to determining whether the juvenile's sentence will be imposed with or without parole. Louisiana Code of Criminal Procedure Article 878.1 likewise gives the sentencer examples of what it may consider when deciding whether a juvenile homicide offender is eligible for parole but also allows the sentencer the freedom to consider any other relevant factors ...
After Miller was decided, the Louisiana legislature enacted La. C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E), both of which provide procedural guidelines for parole eligibility regarding offenders who commit first or second degree murder when they are under eighteen years of age. Addressing whether a juvenile offender's life sentence should be imposed with or without parole, La. C.Cr.P. art. 878.1 provides, in pertinent part:
C. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender's level of family support, social history, and such other factors as the court may *188 deem relevant. The admissibility of expert witness testimony in these matters shall be governed by Chapter 7 of the Code of Evidence.
D. The sole purpose of the hearing is to determine whether the sentence shall be imposed with or without parole eligibility. The court shall state for the record the considerations taken into account and the factual basis for its determination. Sentences imposed without parole eligibility and determinations that an offender is not entitled to parole eligibility should normally be reserved for the worst offenders and the worst cases.
In the instant case, at defendant's Miller hearing, the State first introduced all of the evidence from trial. The State then called as a witness Jefferson Parish Sheriff's Office Homicide Detective Brad Roniger, who was the lead detective on this case. As demonstrated through photographs of the crime scene, Detective Roniger testified that anyone who looked through the glass side door of the Pence residence on the date and around the time of the murders would have seen Mrs. Pence's purse on a kitchen island and Mr. Pence asleep in a recliner. Detective Roniger reiterated the coroner's conclusion that Mr. Pence was shot three times while asleep, because his legs were still crossed when he was discovered. The bullet wounds were to Mr. Pence's head, abdomen and leg. Nicolas Pence was shot while in a kneeling position. Detective Roniger recounted that defendant was not carrying a shotgun during the simple burglaries, but armed himself before entering the Pences' home. The shotgun was found underneath defendant's mother's house. Detective Roniger also identified a U.S. Marshal's ballistic vest, similar to the one worn by Harley Smith on the day that defendant attempted to run him over.
The State summarized the aggravating circumstances of the murders of David and Nicholas Pence as follows:
THE STATE:
...
We're not talking about some sort of crime of passion or some other circumstance that we in this building often see homicides occur from. He [defendant] went in there knowingly armed with a shotgun. He got the purse either before or after. The crux of this Miller hearing is that when he got inside, he saw David Pence sleeping in his chair, went over. He shot him once in the head, and then he shot him two more times. The only reason why somebody, why an individual shoots somebody in the head with a shotgun and then shoots them two more times is because they want to do it, they like to do it, they like the power of it.
Nicholas Pence hears the loud noises, comes around the corner, and then we don't know if he was ordered down or if he voluntarily got down, but then he was executed as well, just like David Pence was. Again, this is not a gun goes off in a drug deal. This is not two guys who have a longstanding beef. This is-the word unnecessary does not do it justice when you enter a person's house presumably to get a purse and then you shoot a sleeping man and then you shoot his son who comes in to see what's going on.
He had what they were there for. They could have easily gone in, got the purse, and left. It would have taken not even a second. But the choice, the unnecessary choice to proceed further into the house to that EasyChair is why the State feels that life without parole is warranted. It was unnecessary to shoot David *189 Pence. It was unnecessary to shoot him three times. It was unnecessary-all he had to do was order Nick Pence down and leave. He didn't. He shot him twice as well.
It was completely unnecessary to try to run over Harley Smith, the U.S. Marshal, who was clearly a law enforcement officer.
During sentencing, the trial court provided reasons why it imposed defendant's life sentence without the possibility of parole:
THE COURT:
...
The Court has been with this case since its inception. The Court has had the opportunity to observe Mr. Allen. At no time has this Court seen Mr. Allen show any emotion other than anger. There has been no remorse. There's been no request to say "I'm sorry" or request for forgiveness from the family.
...
By any definition, the murders of David and Nicholas Pence were heinous. David Pence was shot and killed while he slept, not once, but three times. I still remember the demonstration of the officer showing what physical effort it took to pump that shotgun three times. And then with the house filled with smoke and the smell of burning gunpowder, you pumped two more shots into Nicholas Pence.
The case of Dove says that we have to determine whether or not you are irreparably corrupted. This was not an act of immaturity but an intentional, horrible act. The horror inflicted on this family was evident from the moment that Beth Pence picked up that phone and called 911. I watched you during that phone call as it was being replayed, Mr. Allen. You showed no emotion. How you cannot feel for the mother of Nicholas Pence and the wife of David Pence for the horror that you caused them is cold. They were a family, and you took that away from them.
While I will never know and they will never know why you did that, I can make sure that you never have the opportunity to do it again.
In State v. Smoot , 13-453 (La. App. 5 Cir. 1/15/14), 134 So.3d 1, writ denied , 14-0297 (La. 9/12/14), 147 So.3d 704, this Court found that the trial court complied with the Miller principles at the sentencing hearing and thereafter affirmed the imposition of a life imprisonment without benefit of parole, probation, or suspension of sentence upon a juvenile defendant who shot an elderly, homeless drug addict multiple times. This Court noted that the trial court considered mitigating factors and particularly took defendant's youth into account before imposing the sentence. Here, as in Smoot , it appears that the trial court complied with the sentencing directives set forth in Miller . All Miller requires is "a hearing at which youth-related mitigating factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility." State v. Jones , 15-157 (La. App. 5 Cir. 9/23/15), 176 So.3d 713, 718 (citing State v. Fletcher , 49,303 (La. App. 2 Cir. 10/1/14), 149 So.3d 934, cert. denied , --- U.S. ----, 136 S.Ct. 254, 193 L.Ed.2d 189 (2015) ). As evidenced by the trial court's extensive reasons, the trial court clearly considered defendant's youth at the time of the offenses, as well as all the other mitigating circumstances; however, based on the facts of the case and the violence and brutality of the crimes committed, the trial court believed that the denial of parole was warranted.
*190 Pursuant to a careful review of the record, we find that the sentences imposed are not grossly out of proportion to the seriousness of the offenses so as to shock our sense of justice and therefore conclude that the life sentences without benefits imposed on defendant are not excessive. Accordingly, we find this assignment to be without merit.
In his third assignment of error, citing La. C.Cr.P. art. 905.2[5] and jurisprudence involving capital punishment, defendant contends that because Christopher Meyer, a friend of Nicholas Pence, gave a statement wherein he discussed how Nicholas' death had impacted him, a non-family member, the statement was improper because it exceeded the scope of La. C.Cr.P. art. 905.2(A). Defendant also argues that Elizabeth Branley Pence's statement exceeded the scope of La. C.Cr.P. art. 905.2(A) because she made a recommendation to the district court of a possible sentence for defendant. Defendant concludes that the district court's acceptance of these two statements, which went beyond the statutory boundaries of La. C.Cr.P. art. 905.2(A), amounts to reversible error and should not be cloaked under the harmless error rule.
On February 24, 2017, defendant filed a Motion to Exclude Victim Impact Statement, arguing to prohibit the admission of irrelevant, inflammatory and overwhelming victim impact evidence in the sentencing phase of defendant's trial. He argued that in the capital context, characterizations of the offense and defendant are prohibited by the Eighth Amendment, and so too should be prohibited in the context of his Miller hearing. Alternatively, he argued that the court should limit the number of victim impact witnesses. The State filed opposition noting that all the cases relied upon by defendant discussed victim impact evidence in the context of capital cases, and that while Miller and other relevant Supreme Court jurisprudence drew analogies between the death penalty for adults and life without parole for juveniles, such analogies do not establish that a Miller hearing is the functional equivalent of a capital sentencing hearing, and as such, defendant's cited case had little to no instructive value. At the hearing on the motion on April 5, 2017, the trial court denied the motion to exclude the victim impact evidence, as it found that "these are allowed under the law" but also "with the understanding that the State is not going to bring in witnesses against Mr. Allen unless the defense makes it an issue and at which time they reserve the right to rebut."
La. R.S. 46:1844 (K)(3)(b) provides, in pertinent part:
At the sentencing hearing, the court shall afford the counsel for the defendant, the attorney for the state, and the victim or designated family member an opportunity to comment upon matters relating to the appropriate sentence.
In the specific context of a Miller hearing, the Louisiana Supreme Court has sanctioned the consideration of victim impact evidence. In State v. Montgomery , 13-1163 (La. 6/28/16), 194 So.3d 606, the Supreme Court provided guidance to the district courts in adjudicating Miller hearings. Taking note that the factors enumerated in La. C.Cr.P. art. 878.1 were not exhaustive, the Louisiana Supreme Court observed that other states have also legislatively implemented Miller and in particular sanctioned the use of the factors enumerated in *191 Florida law, including "[t]he effect of the crime on the victim's family and on the community." Montgomery , 13-1163, 194 So.3d at 609. As such, Louisiana law and jurisprudence sanction victim impact evidence in the context of a Miller hearing.
The record shows that defense counsel lodged several objections at the hearing on April 20, 2017.[6] However, because defendant did not object to the testimony of Nicholas Pence's friend, Christopher Meyer, we find that any challenge to his testimony is waived on appeal.[7] Nevertheless, as per Montgomery, supra, we find the admission of Meyer's impact testimony is consistent with showing the effect of Nicholas Pence's murder on the community where he lived.
While defendant argues that it is impermissible for victim impact statements to include opinions on sentencing, other Louisiana courts have found no error under similar circumstances.[8] In the instant case, the record demonstrates that the trial court placed Beth Pence's statement regarding the murder of her husband and son, in the proper context.
THE COURT:
The Court notes your objection for the record. The Court believes that though she can make that request in her statement, the final decision is left up to the Court, and the Court will give it whatever weight he believes it's entitled to.
Defendant gives no authority to support his contention that a Miller hearing should be considered the functional equivalent of a capital sentencing hearing; he further cites no case applying La. C.Cr.P. art. 905.2(A) to a Miller hearing. As noted by the Second Circuit in State v. Fletcher , 49,303 (La. App. 2 Cir. 10/1/14), 149 So.3d 934, 949 :
Nothing in Miller prohibits the sentencing court from considering the devastating emotional trauma suffered by these relatives who continue to grieve for the murder victims and to fear for their own safety. Furthermore, La. C. Cr. P. art. 878.1 provides that the aggravating and mitigating evidence introduced at a Miller hearing may include "the offender's level of family support" and "such other factors as the court may deem relevant."
*192 Accordingly, we find no trial court error in allowing the victim impact statements in this matter.
ERRORS PATENT REVIEW
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). The following matters are noted.
On counts five through 23, La. R.S. 14:62 provides that the term of imprisonment for simple burglary shall be "with or without hard labor for not more than twelve years." Although the commitment reflects that defendant's sentences on counts five through 23 were imposed at hard labor, the transcript does not reflect that the judge ordered that the sentences would be imposed at hard labor or provided that the sentence would be served with the Department of Corrections. Generally, where there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch , 441 So.2d 732, 734 (La. 1983). Where, as in this case, the applicable sentencing statute allows discretion, the sentencing court's failure to indicate whether the sentence is to be served at hard labor is an impermissible, indeterminate sentence. State v. Joseph , 16-191 (La. App. 5 Cir. 12/7/16), 205 So.3d 1013, writ denied , 17-0299 (La. 11/17/17), 230 So.3d 216 ; State v. Horton , 09-250 (La. App. 5 Cir. 10/27/09), 28 So.3d 370, 376-77. Accordingly, we vacate defendant's sentences on count five through 23 and remand the matter to the trial court for the imposition of a determinate sentence in accordance with La. C.Cr.P. art. 879.
Also, the transcript from the hearing on defendant's motion to reconsider sentence indicates that the trial judge advised defendant that he had "two years after the sentence becomes final to file for post-conviction relief," which is incomplete. It is well-settled that if a trial court provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Neely , 08-707 (La. App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-0248 (La. 10/30/09), 21 So.3d 272 ; State v. Davenport , 08-463 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied , 09-0158 (La. 10/16/09), 19 So.3d 473. Accordingly, we advise defendant by way of this opinion that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.
DECREE
For the foregoing reasons, defendant's convictions are affirmed, and his life sentences for his second degree murder convictions, without benefit of parole, probation, or suspension of sentence, are affirmed. We vacate defendant's sentences on counts five through 23 and remand this matter to the district court for the imposition of determinate sentences for defendant's simple burglary convictions.
AFFIRMED IN PART; REVERSED IN PART; REMANDED

Also charged in the indictment was co-defendant Haraquon Degruy, who was alleged to be a principal in the second degree murders of David Pence and Nicholas Pence, as well as for the 21 remaining counts of simple burglary.

The record does show that defense counsel requested and was granted several subpoenas duces tecum for defendant's records from school and from other institutions that may have had information pertaining to defendant's early life. However, defendant did not introduce any documentation at the Miller hearing.

In State v. Jackson , 608 So.2d 949 (La. 1992), the Supreme Court held that the State may introduce evidence of unadjudicated and unrelated criminal conduct in the penalty phase of a capital trial once the trial judge has determined: "(1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing, (2) the proffered evidence is otherwise competent and reliable, and (3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is [the] focus of the sentencing hearing under Article 905.2." Jackson , 608 So.2d at 955. Jackson limited the criminal conduct for which the prosecutor may introduce evidence in the case-in-chief in the capital sentencing hearing to that which involves violence against the person of the victim and conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried. Id. , 608 So.2d at 955. The hearing to determine whether other crimes evidence is admissible in the penalty phase is often called a "Jackson" hearing.

State v. Bernard, 92-0997 (La. 11/12/92), 608 So.2d 966, held that victim impact evidence, which it defined as evidence of the character of the victim, evidence of the emotional, physical, and economic impact of the crime on the family of the murdered victim, excluding evidence of the survivors' opinions of the crime and of the murderer, is admissible at the capital sentencing hearing to show the character and propensities of the defendant and the circumstances of the crime. Bernard , 92-0997, 608 So.2d at 967-68, 972.

La. C.Cr.P. art. 905.2 provides guidelines for the use of victim impact evidence in a capital case.

Generally, defendant objected to the Miller hearing going forward while writs were still pending at the Louisiana Supreme Court. During Detective Roniger's testimony, defendant objected to any speculation that defendant could have stolen items from the Pence residence without having to shoot either David or Nicholas Pence. With respect to Tara Pence's testimony, defendant objected to her using the word "brutally" in the sentence, "In three days, it will be the two-year anniversary of the last time I saw my dad and brother, two years since a convicted murderer came into my house and brutally murdered them for a purse and an I-phone." Finally, defendant objected to the portion of Beth Pence's statement about what she wanted the sentence to be.

See La. C.Cr.P. art. 841, State v. Berroa-Ryes , 12-581 (La. App. 5 Cir. 1/30/13), 109 So.3d 487, 498 ; State v. Richoux , 11-1112 (La. App. 5 Cir. 9/11/12), 101 So.3d 483, 490-491, writ denied , 12-2215 (La. 4/1/13), 110 So.3d 139 ; State v. Alvarez , 10-925 (La. App. 5 Cir. 6/29/11), 71 So.3d 1079, 1085.

For example, in State v. Reese , 13-1905, 2014 La. App. Unpub. LEXIS 388, 2014 WL 3843859 (La. App. 1 Cir. 6/25/14) (unpublished), defendant, a 16 year old, pled guilty to second degree murder and was sentenced to life without parole. On appeal, the defendant claimed that the trial court erred in allowing improper victim impact statements at his Miller hearing, including from victim's father, who asked for the maximum sentence. Among other considerations, the First Circuit surmised that, even if the victim impact testimony had exceeded permissible boundaries, "surely the trial court regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one."